**STATE of Minnesota, Respondent,**

v.

**Orville BERNDT, Jr., Appellant.**

**No. C2–84–1661.**

Supreme Court of Minnesota.

Aug. 29, 1986.

William R. Kennedy, Hennepin County Public Defender, David Knutson, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Beverly J. Wolfe, Asst. Co. Atty., Minneapolis, for respondent.

KELLEY, Justice.

Orville Berndt appeals from his convictions on eight counts of first degree murder arising out of the deaths of his wife, her two sons by a previous marriage, and the son of his wife and himself. All four perished in a fire in August 1981 at the family duplex home in Brooklyn Center. On appeal, Berndt claims that the evidence was insufficient to sustain the convictions.[1] We agree. Accordingly, we reverse.

---

1. In addition to raising the insufficiency of the evidence issue, appellant has alleged violation of discovery rules, an unconstitutional search, and deprivation of a fair trial. Our disposition makes it unnecessary to address those issues.

On August 20, 1981, appellant Orville Berndt lived in a townhouse residence in Brooklyn Center with his wife, Brenda; their son, Corey, age 3½; and Brenda's sons, Richard Gage, age 13; and Michael Gage, age 10. Early in the evening after work on August 20, Berndt and his wife went to consult with their automobile insurance agent to obtain insurance coverage on a recently acquired used car. After completing that business, the couple first visited two bars, and later ended up at the Earle Brown Bowl, ostensibly to celebrate the car purchase. They remained there, drinking beer and visiting with others until shortly before 1 a.m., August 21. During the course of the evening, in addition to the beer, Berndt also imbibed two shots of tequila, and smoked some marijuana. Witnesses who observed the Berndts that night observed no arguments or altercations between them, and described everyone there as having a good time.

When the couple arrived home, appellant, who had not eaten an evening meal after work, fixed himself something to eat. Thereafter, he smoked a cigarette with Brenda, lay down on the couch, and eventually fell asleep while watching television. Brenda was apparently in the room with him. The three children were sleeping upstairs. Suddenly appellant was awakened, by whom or what he is not sure, but he saw flames by the dining room window. The house was extremely hot and full of smoke. Brenda appeared to be heading through the dining room toward the kitchen area.[2] Appellant was confused; he panicked, and then ran out the front door. Shortly afterwards, the house burst into flames.

As Berndt came out the door, his next-door neighbor heard him screaming for the fire department. The authorities were immediately called. While waiting for the fire fighters, appellant tried to douse the fire with a garden hose.

Police Officer Adams was the first official on the scene. At the time he arrived, the second story was not burning. Both Adams and appellant searched for a ladder to attempt to save the children on the second floor. The search proved fruitless.

When fire fighters eventually arrived,[3] appellant was extremely vocal, and voiced his indignation and ire at what he considered an exorbitant lapse of time before fire fighters responded to the alarm. He acted in a hysterical manner, shouting obscenities at the fire fighters and police. His actions so interfered with the fire fighters, they decided to remove him from the scene. Berndt then was transported in a police squad car to his sister's house in Maple Grove by Police Officer Adams.

Adams remained with appellant in Maple Grove until he was ordered by Brooklyn Center Fire Marshal Jerry Pedlar to bring Berndt to the Brooklyn Center Police Department for interrogation. Pedlar had been at the fire scene early. From his observation of the fire's unusual and rapid acceleration, he concluded it might have had an intentional origin. Pedlar ordered Officer Adams to treat Berndt as an arson suspect during the return ride to Brooklyn Center because appellant was the only surviving family member.

At approximately 6 a.m., Adams and appellant arrived at the Brooklyn Center Police Station. Immediately after arrival at the police station, Berndt spent approximately 45 minutes in private with a minister, Chaplain Bodin, who informed him of the deaths of members of his family and counseled him.

Thereafter, Pedlar, a Brooklyn Center Police Department detective, and two deputies from the Hennepin County Sheriff's office jointly questioned appellant. They

2. Immediately after the fire, appellant appeared confused as to what action Brenda had taken. In general, however, in each version, he indicated Brenda was heading into the dining room while he panicked and ran from the house because of the heat and smoke.

3. The time lapse between the alarm and the response of the fire fighters is in dispute—the evidence ranges from 5 minutes to a half hour.

informed him that they suspected he had intentionally set the fire because of the rapid spread of the fire and because he was the only family survivor. After being given the Miranda warning and after agreeing to talk, Berndt related the events of the previous evening leading up to his discovery of the fire and his escape from the burning house. Following this police interview, a blood sample was taken from appellant at North Memorial Medical Center. Medical testimony at the trial indicated that appellant's blood alcohol level at the time of the fire could have been as high as .12 or .13 percent.

At all times during the early morning hours of August 21, Berndt wore the clothing he had continuously worn since returning home from work the previous evening. At the fire scene, a neighbor woman, seeking to solace Berndt, hugged him. She detected no odor of gasoline on his person. Officer Adams was in close proximity to appellant during the drive in a closed police squad car from Brooklyn Center to Maple Grove and back, but he noted no odor of gasoline on Berndt or his clothing. Chaplain Bodin, who had counseled Berndt for approximately 45 minutes at the police station, detected no odor of gasoline on appellant or his clothing. None of the interrogating officers at the Brooklyn Center Police Department, who were investigating what they considered an incendiary fire, testified to the existence of a gasoline odor on appellant. Trained fire and arson investigators suspecting the use of a fire accelerant to commit arson undoubtedly would be very conscious of the existence of such odors. Hospital technicians who drew Berndt's blood to analyze his blood alcohol level must have been in close proximity with appellant. The state, however, offered no testimony from any hospital personnel on the existence of a gasoline odor on Berndt. Finally, experienced police and fire investigators did not confiscate appellant's clothing.

From August 21 to August 24, 1981, arson investigators collected 26 physical samples from the remains of the Berndt townhouse. These included wood cuttings, pieces of carpeting, and vinyl tile. Investigators also videotaped and photographed areas inside the townhouse. Later these samples were analyzed by the use of gas chromatography. The state's analyst concluded that five of the samples indicated the presence of an accelerant—most probably gasoline.[4]

Other witnesses testified that to ignite a fire which would exhibit the burning characteristics of the Berndt fire would require the use of at least 5 gallons of gasoline. The state theorized these 5 gallons had been carefully poured throughout the townhouse, up the stairs and around the children's bedrooms, to insure a fatal conflagration. Had the gasoline been poured throughout the house in the manner hypothesized by the state, it is clear the pouring would have been just before ignition or otherwise its presence would have been obvious to Brenda through her senses of sight and smell. Of course, if she had been unconscious as the result of a fracture or concussion, such observation might have been impossible. However, notwithstanding the severe burning of her body, the Hennepin County medical examiner was able to determine that prior to the fire

---

**4.** At the trial, and in post-trial proceedings, the completeness and validity of the tests performed by the state's expert analyst were matters of considerable dispute.

The state's hypothesis, based substantially on the testimony of the test results by its expert, was that the fire had been set by using gasoline as an accelerant. In corroboration of its theory, the state had other evidence that a fire exhibiting the characteristics of the Berndt fire could not have been accidentally ignited through faulty electrical connection, a smoldering ciga-

rette, ignition of carpeting, etc. Appellant, to the contrary, presented testimony that the fire was a "flash back" fire. A flash back fire is created when a fresh supply of oxygen, such as a door opening, reignites a smoldering fire or a build-up of gases, and the resulting fire flashes back across a room. Because the state's case relies so heavily on the premise that a gasoline accelerant was employed, for the purpose of this opinion we examine the record to ascertain if any nexus exists between appellant and any gasoline.

Brenda had not suffered any major type of injury prior to her fire death.[5]

Even if the state's theory is assumed correct, there is no explanation how someone like Berndt, who, after a day's work, has spent an evening drinking and smoking marijuana, and who had an estimated blood alcohol content at the time of the fire of .12 or .13 percent, could have carefully poured gasoline throughout the townhouse in the intricate pattern posited by the state without spilling some of it on his person or clothing. The odor of spilled gasoline on skin or clothing is not easily eliminated. Yet, no witness—lay, police, or fire fighter—smelled any gasoline odor at the fire scene. Nor did any witness that morning smell the odor of gasoline on Berndt outside the burning building, in the squad car, in the police interrogation room or, apparently, at the hospital.

Furthermore, the record is completely devoid of any testimony or other evidence that Berndt had acquired 5 gallons of gasoline. No showing exists that Berndt ever purchased gasoline by container, or that he ever possessed a gas can. No evidence was produced that any person residing in the townhouse project area was missing any gasoline nor any container.

Within a very short time after arriving at the fire scene, authorities suspected appellant had torched the home. Although police and fire officials essentially had exclusive control of the fire remains for at least four days after the fire, they found no containers which could have held the gasoline used as an accelerant, nor did they find siphoning equipment to link Berndt to this fire. Notwithstanding the absence of such tools, the state, by pure speculation, theorized either that (1) appellant had stolen the gas from the caretaker's supplies, or (2) appellant had siphoned the gas from cars in the parking lot, or (3) the reason no gas can or siphoning equipment was found

was that in all probability Berndt had thrown it into a garbage dumpster which had been unloaded the morning after the fire.

All three of those contentions were purely speculative with no factual basis. The caretaker testified that none of his gasoline was missing. There was complete absence of any evidence to substantiate the claim appellant had siphoned gas from parked cars. Though a dumpster had been unloaded the morning of the fire, absolutely no evidence existed that appellant had thrown anything into it. In sum, nothing in the evidence justifies an inference establishing a nexus between appellant and the gasoline—at least 5 gallons of it—used to accelerate the townhouse fire.

■ In a first-degree murder prosecution, the state has no burden of establishing a motive for the crime. Nonetheless, if the state can establish a credible motive, credibility is lent to the state's contention that the accused committed the crime. The state in this case sought to establish a motive by introducing evidence relating to Berndt's relationship with Brenda, in particular, his propensity to flirt and be promiscuous. Incidents in corroboration of this contention occurred long before the fire date. Moreover, appellant did not deny the incidents, but contended those problems had been resolved well before the fire. No evidence rebuts that assertion. Secondly, the state sought to raise a financial motive by introducing evidence of two insurance policies totaling $33,900 on Brenda's life. Appellant was not named beneficiary on his wife's life insurance policy furnished as an automatic benefit by the State of Minnesota where she was employed. Berndt was surprised to learn that the other policy would pay off the car loan. A reading of the trial record leaves us with the firm impression that the state failed to establish a credible motive for causing Brenda's

5. Because of burns to her head and face, he could not positively rule out a blow to the face

or head, but no fractures were ascertained nor

death.[6] No motive at all was established for the deaths of the children.

■ Absent any direct evidence connecting appellant with gasoline or any other kind of accelerant, it is clear that appellant's conviction was based solely on circumstantial evidence. We recognize that normally a jury is in the best position to evaluate the circumstantial evidence surrounding the crime and that the jury's verdict is entitled to due deference. *See State v. Daniels,* 380 N.W.2d 777 (Minn.1986) and *State v. Anderson,* 379 N.W.2d 70, 75 (Minn.1985). However, as we have previously stated:

> The circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt.

*State v. Jacobson,* 326 N.W.2d 663, 666 (Minn.1982) (citing *State v. Morgan,* 290 Minn. 558, 561, 188 N.W.2d 917, 919 (1971); *State v. Kaster,* 211 Minn. 119, 121, 300 N.W. 897, 899 (1941)). *See also State v. Ngoc Van Vu,* 339 N.W.2d 892, 898 (Minn. 1983); *State v. Threinen,* 328 N.W.2d 154, 156 (Minn.1983); *State v. Gibbons,* 305 N.W.2d 331, 336 (Minn.1981); *State v. Swain,* 269 N.W.2d 707, 712 (Minn.1978).

■ Except for the fact that appellant was physically present in his home when the fire started, there exist no other circumstances consistent with the state's hypothesis of guilt. To the contrary, substantially all of the circumstances are consistent with a rational hypothesis other than guilt. It is not rational to infer that, after a day's work and long hours of drinking and partying, with a blood alcohol content sufficient to make him legally under the influence of alcohol, appellant could slosh 5 gallons of gasoline around the townhouse without almost inevitably spilling some of the gas on himself or his clothing. Yet, no witness, most of whom were in close proximity to him that morning, detected a gasoline odor about his person or clothing, even though authorities almost immediately suspected that he was an arsonist.

Nevertheless, the state contends that the Berndt fire was started and accelerated by the use of gasoline. The bodies of three children had high levels of carbon monoxide—a fact that is inconsistent with the state's theory, but is consistent with the defense theory of a flashback fire. Likewise, the autopsy report on Brenda was more consistent with appellant's theory than with that of the state.

Upon discovery of the fire, appellant claims that he, in panic, rushed from the house. The state suggests the contention is irrational because appellant would have been injured had he left in that manner. Yet, there is evidence appellant had singed hair on the left side of his body, and that all the skin on the bottom of his feet turned brown and peeled off a few days after the fire.

The state's theory with respect to the alleged motive for killing Brenda appears to be without rational basis. Though admitting that in the years before the fire there had been problems between himself and Brenda because of his alleged philandering, the evidence was unrebutted that those disagreements had been ironed out long preceding the fire. The uncontradicted evidence was that appellant loved the boys and enjoyed their company. There exists no consistency, in the light of that undisputed fact, with the state's claim that appellant spread gasoline at the door of the children's bedroom—including that of his own son.

---

any other evidence of trauma to the head observed.

**6.** Admission of evidence of the kind and nature used to suggest a motive for the alleged killings is generally discretionary with the trial court. However, in this case arguably there may have been an abuse of discretion. A reading of the record leaves us with a firm impression that the jury's verdict may well have been tainted by such evidence. Jury members may have convicted Berndt because they were offended by his morals.

The state's entire case was bottomed on mere speculation or upon hypothesized "facts" not in evidence. Notwithstanding the absence of even a scintilla of evidence from any lay or professional witness of any concussion, blow, or fracture to Brenda's head, the state urged the jury to speculate that Berndt and his wife had fought that evening, resulting in a blow to Brenda's head sufficient to render her unconscious.

The state produced evidence which, if credited by the jury, would sustain its contention that the townhouse fire had been ignited with the use of a gasoline accelerant. About all the state produced to show appellant was the culprit was suspicion unsupported by facts. Some circumstances proved were consistent with the state's claim of an intentional fire, but other circumstances proved were generally consistent with the rational hypothesis that the defendant was not guilty.

The state's burden was to prove the arson-murders beyond a reasonable doubt. Here, the state failed to meet that burden. The circumstantial evidence was not inconsistent with a rational hypothesis other than guilt.

Accordingly, the convictions are reversed.