**STATE of Minnesota, Respondent,**

v.

**Donald YEAGER, Appellant.**

**No. C5–86–573.**

Court of Appeals of Minnesota.

Jan. 27, 1987.

Hubert H. Humphrey, III, Atty. Gen., James B. Early, Sp. Asst. Atty. Gen., St. Paul, Robert W. Kelly, Washington Co. Atty., Stillwater, for respondent.

Deborah K. Ellis, Thomson, Hawkins & Ellis, St. Paul, for appellant.

Considered and decided by HUSPENI, P.J., and SEDGWICK and LANSING, JJ., with oral argument waived.

## OPINION

SEDGWICK, Judge.

Donald Yeager was convicted by jury trial of first degree arson in connection with a fire at his rental property. Yeager appeals his conviction on the grounds of sufficiency of the evidence and the exclusion of evidence. He also alleges the trial judge improperly refused to disqualify herself after an affirmative showing of prejudice. We affirm.

## FACTS

On February 21, 1985, Donald Yeager's house on West Oak Street in Stillwater burned and suffered extensive damage.

Yeager rented the property to tenants. The fire stemmed from the ignition of acetone fumes, purportedly by Yeager's cigarette. Shortly after the fire, Yeager was arrested on suspicion of arson. He was later convicted of first degree arson.

Yeager has had problems in recent years. In February 1985 Yeager and his wife were in the process of divorce. In 1982, Yeager lost his job of 14 years and his financial situation began to unravel. Since 1982, Yeager has operated a painting business and worked as a pizza delivery man. He was convicted in 1983 of passing bad checks and in 1985 for welfare fraud.

In February 1985, Yeager and his daughter were residing in the family's home on Hanson Place. He had obtained a position with Unidel Insurance as a salesman/agent with the guarantee of a temporary salary plus future commissions. Prior to the fire, he received several significant cash payments. Just before Christmas, Yeager received a $1,900 insurance check. He also received $1,120 on February 20 as partial payment on a pickup, with another $1,000 to be paid by April 1. Additional insurance money may have been received in January 1985.

Also, in February 1985, Yeager owed $5,000 to Washington County in restitution for the welfare fraud, he was seven months in arrears on the contract for deed on the rental property, and real estate taxes for the second half of 1984 remained unpaid. In May 1984, a cancellation of contract notice had been served on Yeager and his wife. Cancellation was averted at that time. However, a second notice was served in October 1984, and foreclosure was forestalled only by Yeager's filing for a Chapter 13 bankruptcy plan.

Yeager was apparently supposed to carry insurance on the property; however, the coverage in effect at the time of the fire was purchased by the seller. Yeager acquired coverage of $82,000 on the house and $14,000 on personal property, effective February 15, 1985. He made a partial premium payment of $100 on February 20. There is dispute as to whether $82,000 was an inflated or reasonable amount for the house. Yeager listed the property's value as $76,000 in the dissolution proceeding and a realtor valued it at $65,000. Yeager claimed $14,000 in personal property at the rental property. While he apparently provided only a refrigerator and stove to the tenants, he claimed substantial painting equipment, as well as a snowblower and lawnmowers, were kept in the attached garage. A tenant testified the garage contained lawnmowers and some tools. Yeager states he purchased insurance because the need for it was made plain to him at his February 14 bankruptcy court appearance. He did not inform the insurance agent that his wife was a party on the contract for deed.

The fire stemmed from a remodeling project. Yeager decided to pull up the linoleum floor at the rental property in order to add value and promote a faster sale of the property. He purchased two 1–gallon cans of acetone, an extremely flammable substance, to use in removing glue. Yeager worked slowly in the early evening hours and returned home to feed his daughter. He returned to the rental property around 8:30 to 9:00 p.m. to continue the job. By 10:30 p.m., when the last remaining tenant left for work, Yeager had removed the linoleum and had only to remove the glue. Yeager testified he poured acetone on the floor and left the kitchen to have a cigarette.

When Yeager lit his cigarette in the living room, the kitchen exploded in a fireball due to the fumes. Yeager apparently broke a window to escape and attempted to call the fire department from a neighbor's place. Finding no one at home, he drove three blocks to his home (less than a minute's drive) and dialed 911. However, Yeager was in a hysterical state and unable to give the fire's location. A police officer dispatched to the house on Hanson found a sobbing Yeager, who was virtually useless as an information source. The officer, however, knew Yeager owned a house on West Oak and surmised the fire's location. Yeager eventually returned to the

fire scene in a confused and emotional state. Yeager suffered a cut hand, bumped head and singed hair in the fire.

Experts testified that acetone was a very good, but dangerous, substance for removing glue. Yeager's story was a plausible explanation of the fire's origins. However, one of the acetone cans was found on its side, as if the acetone had been spilled on the kitchen floor. The State emphasized that a fire extinguisher was present in the basement. Yeager said he could not reach it because of the fire.

In fighting the fire, firemen attempted to force a kitchen entryway. The door was blocked by a table. Yeager placed it there, ostensibly out of the way, when he was removing the linoleum. He stated that the doors were broken and seldom used, and were both marked by signs reading "use other door." Witnesses confirmed the presence of the signs. Yeager admitted parking his car on the street, even though he normally parked in the driveway, but said it was because on Thursday nights his tenants commonly partied when the late shift ended. He left his car on the street to avoid being blocked in. It was also considered curious that Yeager was working so late, and that the fire occurred during the short time span (approximately 10:30 p.m. to 11:30 p.m.) between one tenant's departure for work and the arrival of the other two tenants when their shifts ended at 11:00 p.m. Yeager responds that the "party facilities" were in the basement and he was not in the way.

The tenants of West Oak at the time of the fire testified they lived in the house for 2½ years, saw Yeager often and even allowed Yeager to live in the basement for two months during his separation. Donald Melcher stated that Yeager mentioned setting the house on fire three times. One time he threatened to burn the house to prevent his wife from getting it through divorce. This threat was made at least a year before the fire. Another time he related a plan to heat pipes in the basement, which would smolder and eventually ignite the insulation. John Fashingbauer also testified to the same effect.

Finally, the tenants testified that on the day of the fire, Yeager related a plan to burn the house when he was removing the kitchen flooring. Gary Bryant, a former tenant but present that day, testified to Yeager's threat.

> Well, he started talking about doing construction on the kitchen floor. He was going to pull up the old floor and repair it. And at that time he had stated that he was going to burn the house down that night and blame it on the fire.
>
> Q. Do you remember any specific words he said at that time?
>
> A. The exact words were, "I'm going to burn the son of a bitch down tonight."

Gary Bryant admitted on cross-examination that he had been ejected from the premises for non-payment of rent, in January. However, he said his debt to Yeager was squared.

Yeager's daughter, Michelle, testified that the kitchen floor was being replaced since they planned to move into the West Oak Street house within a month or two. The tenants, on a month to month lease arrangement, denied any knowledge of notice or the move.

## ISSUES

1. Was the evidence sufficient to convict appellant of arson in the first degree?

2. Should the substituted trial judge have removed herself due to prejudice?

3. Did the trial court commit reversible error when it failed to admit appellant's explanation of a prior conviction for passing bad checks?

## ANALYSIS

1. Sufficiency of the evidence.

■ The crime of arson in the first degree contains an intent requirement. Minn.Stat. § 609.561, subd. 1 (1984). The State consequently had to prove, beyond reasonable doubt, that Yeager intentionally

set the fire. *See* Minn.Stat. § 611.02 (1984). Since Yeager admitted responsibility for the fire, the State needed only to show intent. The prosecution presented a great deal of circumstantial evidence suggesting a motive, as well as direct evidence of Yeager's statements of intent to burn the house.

A jury's evaluation of circumstantial evidence, as represented by the verdict, is entitled to deference. *State v. Berndt,* 392 N.W.2d 876, 880 (Minn.1986). However,

> [t]he circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt.

*Id.* (citations omitted).

■ The prosecution's case showed that Yeager had experienced financial difficulties. The evidence suggested the fire was an attempt to escape a major financial liability as well as to reap a benefit, the insurance proceeds. Although Yeager had plausible explanations for almost all of the circumstantial evidence, his counsel was unable to discredit the tenants' testimony on his various statements of intention to burn down the house.

> We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. * * * If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, the verdict will not be reversed.

*State v. Turnipseed,* 297 N.W.2d 308, 313 (Minn.1980) (citations omitted).

The combination of the circumstantial evidence and appellant's statements are sufficient to sustain the conviction.

2. Failure to Disqualify.

Yeager moved to disqualify the initial trial judge under Minn.Stat. § 542.16, subd. 1 (1984). He then sought to disqualify the substituted trial judge on the basis of bias. Appellant charges the judge made derogatory statements concerning him in another proceeding, heard statements in another action to the effect he burned his house, and that the judge had sentenced him in connection with his welfare fraud conviction. The judge denied the motion.

Minn.Stat. § 542.16, subd. 2 (1984), requires the moving party to show prejudice.

> After a litigant has once disqualified a presiding judge as a matter of right under subdivision 1, he may disqualify the substitute judge, but only by making an affirmative showing of prejudice. A showing that the judge might be excluded for bias from acting as a juror in the matter constitutes an affirmative showing of prejudice.

The statute relates the standard for judicial prejudice to the standard used to remove a juror for bias. Minn.R.Crim.P. 26.-02, subd. 5(1), states a juror may be challenged for cause if

> [t]he existence of a state of mind of the juror, in reference to the case or to either party, which satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the party challenging.

■ Appellant provides no evidence of any derogatory remark he claims was made by the court. The fact that a judge is familiar with a defendant is not an affirmative showing of prejudice. Furthermore, the "proper remedy to pursue when a motion to remove has been denied is to seek a writ of prohibition." *State v. Cermak,* 350 N.W.2d 328, 331 (Minn.1984).

3. Explanation of Prior Convictions.

■ On direct examination, Yeager admitted prior convictions for welfare fraud and writing bad checks. When he sought to explain his conviction for passing bad checks, the trial court upheld the State's objection. The State did not object when Yeager explained that he did not realize he had an obligation to report rental income

on the application for public assistance which led to his conviction for welfare fraud. Yeager alleges it was error to exclude his explanation of his bad check conviction.

The substance of the excluded evidence was an explanation, "I was given a parole because of extenuating circumstances."

Minnesota does not appear to have addressed the question of whether a witness may minimize prior convictions through explanation. In *Lamoureux v. New York, New Haven and Hartford R.R.*, 169 Mass. 338, 47 N.E. 1009 (1897) (Holmes, J.), the court did not allow rehabilitation of a witness on redirect when the witness had been discredited on cross by a prior conviction. Evidence of the circumstances of the conviction and "the extent of the wickedness involved in the act" was properly excluded.

> Logically, there is no doubt that evidence tending to diminish the wickedness of the act, like evidence of good character, which is admissible, does meet, as far as it goes, the evidence afforded by the conviction, since that discredits only by tending to show either general bad character, or bad character, of a kind more or less likely to be associated with untruthfulness. Nevertheless the conviction must be left unexplained. Obviously, the guilt of the witness cannot be retried. It is equally impossible to go behind the sentence to determine the degree of guilt. Apart from any technical objection, it is impracticable to introduce what may be a long investigation of a wholly collateral matter into a case to which it is foreign * * *.

*Id.* at 340, 47 N.E. at 1010 (citations omitted).

In *United States v. Plante*, 472 F.2d 829 (1st Cir.), *cert. denied*, 411 U.S. 950, 93 S.Ct. 1932, 36 L.Ed.2d 411 (1973), the *Lamoureux* approach was adopted when the prosecution attempted to inquire about a prior conviction admitted on direct by defendant's witness.

> We believe that neither party should be able to develop the details. To permit the opponent to do so tends unduly to prejudice the witness * * * and in all cases it leads to a collateral issue, with frequently one party or another at a disadvantage.

*Id.* at 832 (citations omitted); *see also Rogers v. Baltimore & Ohio R.R.*, 325 F.2d 134, 137 (6th Cir.1963) ("Interrogation may concern only whether the witness has been convicted of a felony or a crime * * * and it permits of no further proof or explanation.").

Other authorities have permitted brief explanations to explain convictions. *See United States v. Crisafi*, 304 F.2d 803, 804 (2d Cir.1962) (a brief explanation of the prior conviction may be used to rehabilitate a witness); *Dryden v. United States*, 237 F.2d 517 (5th Cir.1956) (a witness may attempt to explain away prior convictions); *McCormick on Evidence*, § 43, at 99 (E. Cleary 3d ed.1984) ("a substantial number of courts, while not opening the door to a retrial of the conviction, do permit the witness himself to make a brief and general statement in explanation, mitigation, or denial of guilt, or recognize a discretion in the trial judge to permit it").

■ We believe the decision of whether to permit a witness to give a brief statement of circumstances surrounding a prior conviction is best left to the sound discretion of the trial court. There was no error here.

## DECISION

Affirmed.