STATE of Minnesota, Respondent,

v.

Seldon P. FORMO, Appellant.

No. C9–87–554.

Court of Appeals of Minnesota.

Dec. 8, 1987.

Review Granted Feb. 17, 1988.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Sp. Asst. Atty. Gen., St. Paul, Ann L. Carrott, Douglas Co. Atty., Alexandria, for respondent.

C. Paul Jones, Public Defender, Steven P. Russett, Asst. Public Defender, St. Paul, for appellant.

HEARD, considered and decided by CRIPPEN, P.J., and FOLEY and LANSING, JJ.

## OPINION

LANSING, Judge.

Seldon Formo was convicted of first-degree arson and defrauding an insurer. On appeal Formo contends that the evidence was insufficient to sustain his conviction, he was denied his right to a speedy trial, and the court erred in its evidentiary rulings. We reverse Formo's convictions.

## FACTS

In December 1985 Seldon Formo lived on five acres of property located 1¼ miles east of Nelson, Minnesota. The property included a house, a garage, a shed and a chicken coop. The house, a two-story, wood-frame structure with four bedrooms and a full basement, had been built in 1920. It had two main entrances which were usually locked, one on the north side opening into the kitchen, and the other, not often used, on the east side opening into the dining room. Formo carried a house key and kept a spare key beneath a refrigerator near the north entrance. There was also a door into the basement.

Formo bought the property for $20,000 in October 1985 at a foreclosure sale. He obtained insurance as part of the purchase agreement—$52,500 on the house, $5,250 on the outbuildings, and $31,500 on his personal belongings. The insurer set the amounts according to its formula for evaluating risks.

After buying the house, Formo spent $2,000 for renovations. He painted, recarpeted, replaced the well pump and made minor repairs to the furnace. Formo had not owned a home before and intended to further renovate and purchase livestock.

Formo was employed as a bartender/manager at Diamond Jim's, a bar in Nelson, and grossed about $800 per month. He made monthly house payments, including insurance and taxes, of $211. He also paid $150 per month child support. The

purchase of the property did not substantially increase his monthly expenses.

Formo spent the night of December 12 at Sheryl Storeby's house. Storeby was married but separated from her husband. Formo was also married but separated. On the morning of December 13, Formo and Storeby stopped at his house about 7:30 to drop off his dog and continued into Nelson, where Storeby dropped Formo at work.

Later that morning, Formo contacted his wife and made plans to meet her after work. Formo finished work at 5:00 and talked with his wife for about ten minutes. He then told her he wanted to check on his furnace, which had not been working properly. He borrowed a diesel pickup truck from a friend, leaving Diamond Jim's at about 5:10.

Formo testified he arrived at his house at 5:15, confirmed that the furnace was working, took fish from his freezer for his friend's mother and left. In all, he was in the house less than five minutes and did not enter any room other than the kitchen. As Formo started to back the truck out of the driveway, it stalled and he was unsuccessful in attempting to restart it.

Formo left the truck and walked to the home of a neighbor, Joseph Posledni, about one-quarter mile away. He arrived there between 5:30 and 5:45 and asked Posledni to help start the truck or tow it. Posledni told Formo he did not have a vehicle that could tow Elsner's pickup, but offered him a ride into town. Formo was in the Posledni home for five to ten minutes while Posledni finished his supper and put on warm clothes. Neither Posledni nor his wife smelled any unusual odor on Formo, and during the drive into town Posledni sat within two feet of Formo and did not notice any unusual smells. Posledni dropped Formo at Diamond Jim's and returned home.

Formo arrived at his home about 6:30 with four friends to start the stalled pickup. As they drove up, he saw smoke coming from under the eaves. He tried to enter the house to fight the fire, but was dissuaded by his friends. He then drove to Posledni's to call the Osakis Fire Department. When Formo reached the Poslednis' he was visibly upset, pale and physically shaking. He was barely able to place the call to the fire department. Osakis firefighter Edward Pollard received Formo's call at 6:45 p.m. Formo gave Pollard explicit directions to his house. After reporting the fire, Formo returned to his house, parking at the end of the road to keep the driveway clear for the fire trucks. The fire crew arrived within ten minutes of the call.

Throughout the fire, Formo assisted the firefighters. The firefighters went to the east door, which they found locked. Formo warned them not to go in the east door because there were shotgun shells near it that might injure them. Several firefighters later reported hearing shotgun shells going off during the fire.

Pollard told them to go to the stairway to the basement and drive the fire out the windows. Formo gave the firefighters accurate directions to the stairway. On the third try they found a hole in the floor where the stairs to the basement were. Formo, meanwhile, kicked in the north door to allow Pollard into the house.

The fire did extensive damage to the house. The kitchen, dining room, bathroom and living room were "flashed over;" that is, extreme heat caused items in these rooms to ignite spontaneously and then, due to a lack of oxygen, quickly burn out. The bedroom on the main floor was gutted. The stairs leading to the second floor were gone. The fire also destroyed personal property—meat from a freezer, a box of mementos including the service medals and burial flag of Formo's deceased father, and the Christmas presents he had bought for his children. Formo was distraught over these losses.

As the firefighters mopped up, they discovered signs of arson. There were several unusual burn patterns in the house, including a 3–5 inch hole in the floor near the base of the second floor stairwell. There were burn patterns in the basement on a beam above the furnace and near an electrical box, which evidenced the presence of an incendiary material. They also discovered two propane torches, one in a box in the

basement and one in a cabinet near the kitchen.

Several days after the fire, Formo called his insurance agent to ask how to file a claim. During a meeting with an insurance adjuster, Formo said he had left his home at 7:30 on the morning of the fire and that his wife had left slightly earlier. In fact, his wife had not stayed at the house that night, and Formo had spent the night at Storeby's. Formo also told the insurance adjuster that he had returned home after 5:00 p.m. on the 13th and that there was a wood fire in the furnace that day. Formo said that he wanted to rebuild his home.

Because of the suspicious nature of the fire, Fire Chief Olson requested investigative assistance from the state fire marshall. Formo gave his consent and Olson, Pollard and arson investigator Ronald Peterson went to the house.

Peterson found three points of origin for the fire. The first was at the base of the stairwell to the second floor, where the burn marks exhibited a downward burn pattern usually associated with the presence of an accelerant. The second point of origin was in the basement. A beam above the furnace was burned on the top and sides only, an indication that a flammable liquid was poured on it. The third point of origin was a 1" by 4" electrical mounting board attached to the ceiling near the beam. The board was later found in the sump. Burns at the top of the board showed signs of the presence of an accelerant; later testing by the Bureau of Criminal Apprehension could not confirm this, however. Recent burn marks were also found on the wall of one of the out-buildings.

Based on his inspection, Peterson concluded the fire was incendiary in nature and had multiple sources. In Peterson's opinion the fire had been burning for about one hour before the firefighters arrived.

Formo was asked to give an interview at the police station on January 6, 1986. He voluntarily appeared and gave a taperecorded statement to BCA agents, answering all the questions which were asked. On January 6, Wellnitz took Storeby's statement. Her statement was consistent with Formo's except that she said he only dropped off his dog on the morning of the 13th and did not enter the house.

In May 1986 Formo was charged with first-degree arson and defrauding an insurer. Trial was scheduled for September 9, 1986. On July 24, 1986, trial was rescheduled to September 16, 1986, because of a conflict in the prosecutor's calendar. At an unknown date, the trial was rescheduled to October 14, 1986. On October 13, 1986, the day before trial was to start, the trial was rescheduled to November 18, 1986, because of the prosecutor's illness. The defense opposed this rescheduling because all the defense witnesses had been subpoenaed; Formo also asserted his right to a speedy trial. On November 18, 1986, the day trial was scheduled to start, it was again rescheduled to December 9, 1986, this time because a civil trial had priority. On December 11 the jury returned a verdict of guilty on both charges. The trial judge denied a defense motion for judgment of acquittal or a new trial. The court imposed the presumptive sentence for first-degree arson, 23 months with sentence executed. No sentence was imposed for defrauding an insurer. This appeal followed.

### ISSUES

1. Was the evidence sufficient as a matter of law to sustain appellant's conviction?

2. Was appellant denied his right to a speedy trial?

3. Did the trial court err in excluding evidence of Robert Storeby's alleged acts of damage to appellant's property?

4. Is appellant entitled to a new trial based on the prosecutor's failure to comply with the rules of discovery?

### I

Formo does not contend the fire was not arson. Rather, he contends there was insufficient evidence that he started it.

In passing on the weight and sufficiency of the evidence, the test is whether, based on the evidence in the record, a jury acting

with due regard for the presumption of innocence and the necessity of overcoming it by proof beyond a reasonable doubt could reasonably conclude the defendant was guilty of the charged crime. *State v. Combs,* 292 Minn. 317, 320, 195 N.W.2d 176, 178 (1972). When making this determination, the evidence on appeal will be viewed in the light most favorable to the state. *State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969).

■ In arson cases it is generally necessary for the state to prove its case with circumstantial evidence. *State v. Jacobson,* 326 N.W.2d 663, 665 (Minn.1982). However, a conviction based on circumstantial evidence will not be sustained on appeal unless the circumstances proved are consistent with a hypothesis of guilt and inconsistent with any other rational hypothesis. *State v. Diamond,* 308 Minn. 444, 447, 241 N.W.2d 95, 98 (1976); *State v. Bergland,* 290 Minn. 249, 253, 187 N.W.2d 622, 625 (1971). *Accord State v. Berndt,* 392 N.W. 2d 876, 880 (Minn.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 909, 93 L.Ed.2d 859 (1987).

The Minnesota Supreme Court has noted that for circumstantial evidence to sustain a conviction, the evidence must "point unerringly to the accused's guilt." *State v. Lundstrom,* 285 Minn. 130, 141, 171 N.W. 2d 718, 725 (1969). When careful scrutiny of the record creates grave doubts as to the guilt of a defendant convicted of a criminal offense, the interests of justice and rights of the accused require that the conviction be reversed. *See Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *State v. Lubenow,* 310 N.W.2d 52 (Minn.1981).

■ The state contends there is sufficient evidence of Formo's motive, means and opportunity to start the fire which sustains the conviction.

### Motive

Formo's house, purchased for $20,000, was insured for $52,500 and his personal property was insured for $31,500. He admitted he did not have $31,500 worth of personal property in his house. Formo was earning about $670 per month net. He was paying $150 per month child support, sometimes missing payments, and his second marriage was not going smoothly. The state contends these facts establish a motive to burn the house, pay off the $20,000 mortgage and pocket the remaining $32,-500, plus the $31,500 in personal property coverage. The state alternatively claims that Formo wanted to replace a 66–year-old house with a modern home at his insurance company's expense.

The evidence does not support the state's conclusions. The amount of insurance was set by the insurance company and Formo had no part in deciding the amount of coverage. In addition, the evidence does not show he was in the deep financial difficulty the state suggests. Formo had trouble paying his child support only when he was out of work. He had been working steadily when he bought the house and was still employed at the time of the fire. Formo's boss testified that Formo was an "outstanding" employee who "took a real interest" in improving business at Diamond Jim's. There was no danger of his losing his job, and his expenses did not increase after buying the house.

Finally, Formo's actions preceding the fire do not show he would burn it down for financial advantage. If he were planning to burn down his house, it is unlikely that he would have spent $2,000 in two months on new carpeting, fresh paint and other renovations. Further, he would not have left all his personal property in the house.

### Means and opportunity

Formo was in the house until approximately 5:30 p.m. the day of the fire. The fire department arrived at the house at approximately 6:55 p.m. Ron Peterson, a fire arson investigator for the state, testified that the fire had burned for about one hour before the fire department arrived. Based on this, the state contends the evidence supports the jury's finding that Formo set the fire.

However, an hour and one-half elapsed between the time Formo left his house and

the arrival of the fire department. This leaves a half-hour period in which someone else could have set the fire. More significantly, Peterson's estimate of the one-hour period was based on a fire with no accelerant. Peterson testified that with an accelerant, the fire would have burned much more quickly. The state's case was based on the presence of an accelerant. This reduces the length of time the fire was burning before the arrival of the fire department and increases the length of time in which somebody else could have set the fire.

Both Joe Posledni and his wife testified that there was no strange or unusual odor about Formo while he was in their house. Posledni testified he did not notice any unusual odors while sitting beside him in the van on the way into town. Finally, Chief Olson, who had been with the Osakis volunteer fire department for 18 years, testified that he spent some time in the command van talking to Formo, but did not testify to smelling any odor of gasoline, kerosene or any other accelerant. It is significant that the presence of an accelerant was suspected the night of the fire. *See Berndt,* 392 N.W.2d at 878 ("[t]rained fire and arson investigators suspecting the use of a fire accelerant to commit arson undoubtedly would be very conscious of the existence of such odors.") Further, the state produced no evidence that a container for the accelerant was found. *Cf. id.* at 879.

The state contends that Formo's presence in the home, combined with the presence of propane torches for ignition, both doors being locked and no sign of a forced entry, are alone sufficient to uphold the jury's verdict. We disagree. There was no evidence that the propane torches were used to light the fire. The presence of propane torches, one in a box in the basement and one in a cabinet in the kitchen, without more, indicates only that Formo owned two propane torches. The fact that the doors were locked and there was no sign of a forced entry is also not as conclusive as the state argues. A key was kept on the porch of the house. Someone who knew about this key could have used it to gain entry.

The state points out that Formo told Chief Olson he had left his house at 7:30 a.m. the morning of the fire and nobody had been in the house after that. This, the state contends, is evidence of Formo's guilty mind, likening it to an excited utterance. *See* Minn.R.Evid. 803(2). Formo's statement to Chief Olson is not evidence of a guilty mind. As he explained at trial:

Q: It is true, is it not, Mr. Formo, that on the nights of the fire you told Mr. Olson that you hadn't been at your house since early that morning?

A: I am not sure who I was speaking to at that time or whatever. *I hadn't been there all day,* which I hadn't.

Chief Olson's testimony on this point was:

Q: Did Mr. Formo talk to you about who, if anyone, had been in the house recently.

A: I asked Seldon if there had been anybody there *during the day,* and he said no, there hadn't been anybody there. He had left about 7:30 that morning to go to work.

(Emphasis added).

From these excerpts, Formo's statements are not inconsistent; he had not been at his house all day. He had been at work all day. He did not go home until after 5:00, when the workday was over.

Finally, the state argues that guilt could be found based on Formo's "cover-up" attempt in putting the electrical board in the basement sump and in telling an insurance adjuster his wife had been at the house that morning. However, there was no evidence that it was Formo who put the board in the sump. Formo's statements about his and his wife's presence or absence in the house are arguably connected to a sensitivity about his marital problems.

The evidence does not support the state's theory. Although the state established that the fire was intentionally set, the evidence does not clearly establish that Seldon Formo set it. The evidence is inconsistent

with a finding that he did. Because careful scrutiny of the record creates grave doubts of Formo's guilt, the interests of justice and rights of the accused require that his conviction be reversed. Because of our holding on the sufficiency issue, we do not reach the other claims of error.

## DECISION

The evidence was insufficient to sustain Formo's conviction. We reverse the judgment of conviction.

Reversed.

CRIPPEN, J., dissents.

CRIPPEN, Judge, dissenting.

Circumstantial evidence is sufficient to sustain a conviction if it is inconsistent with rational hypotheses of innocence. *State v. Berndt*, 392 N.W.2d 876, 880–81 (Minn. 1986).

The trial court first heard appellant's contention on the insufficiency of the evidence in the case. Appellant argued that the reasoning in *Berndt* should prompt a reversal here. Appellant argued "there was just not enough circumstantial evidence" for a conviction. The trial court insisted that "each case must be taken individually," and concluded that there was sufficient evidence for conviction. The record supports the trial court's analysis of the case.

Evidence was sufficient in *Berndt* to show that a fire had an incendiary origin. *Id.* at 881. Here, it is undisputed we are dealing with an arson offense. Both cases require examining whether circumstantial evidence was sufficient to convict the person charged with starting the fire. Because the contentions here so closely resemble those in *Berndt*, and because that decision demonstrated the parameters of deference to the fact-finder, a studied consideration of the case is appropriate here.

There were unusual shortcomings in the state's case in *Berndt*. The state failed to prove the defendant's motive to commit the crime, a problem which was especially glaring in terms of the need to explain why he would cause the death of three children whom he loved and whose company he enjoyed. *Id.* In this case, there is evidence of a financial motive which is inconsistent with appellant's claim of innocence. We cannot substitute our judgment for the jury's in assessing the weight of this evidence.

In *Berndt*, the state's evidence actually demonstrated that it was unlikely the defendant had the means and opportunity to start the fire in question. The evidence showed that at least five gallons of gasoline had been carefully deposited around defendant's townhouse just before the fire, and in spite of the alleged involvement of the defendant in spreading this gasoline there was no evidence of any gas spilled on him or his clothing. *Id.* at 880–81. There is not a comparable defect in the state's evidence in this case. In this regard the majority opinion discusses the evidence as to the time the fire may have been set and the evidence that there was no odor of gasoline on appellant's person or clothing before the fire.

At about 5:45 p.m., appellant arrived at his neighbor's home after leaving his house. The fire department arrived at appellant's house at about 6:55 p.m. The fire marshall's investigator said the fire had been burning for about one hour before the firefighters arrived. Even taking into account evidence as to accelerants, the jury's decision was sufficiently supported by evidence that is inconsistent with defendant's hypothesis of a fire set by someone else.

Appellant did not smell of gasoline. In this case, however, there is no evidence that a considerable quantity of accelerant was used, nor is there any evidence that it was likely applied immediately before the fire was set. Unlike the situation in *Berndt*, the lack of evidence of odor here is not inconsistent with the state's accusation.

Finally, in *Berndt*, the supreme court was prompted to reverse because the entire state's case was "bottomed on mere speculation or upon hypothesized 'facts' not in evidence." *Id.* at 881. Speculation was not required here to reach the conclusion that appellant had motive and opportunity

accounting for a conclusion that he was the person who destroyed his house.

Based on examination of the facts of record, I do not harbor the same grave doubts expressed by the majority. There is sufficient evidence here to sustain the convictions. I respectfully dissent.