**STATE of Minnesota, Respondent,**

v.

**Robert Gene WEBB, Appellant.**

**No. C2–88–1894.**

Supreme Court of Minnesota.

May 26, 1989.

C. Paul Jones, State Public Defender, Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Alan L. Mitchell, St. Louis County Atty., Vernon D. Swanum, Duluth, for respondent.

KEITH, Justice.

Appellant Robert Webb appeals his conviction of first degree premeditated murder. Minn.Stat. § 609.185(1) (1988). He claims among other things that the evidence is insufficient to support the jury's verdict. We agree, and accordingly the conviction must be reversed.

Robert Webb, who is diagnosed as suffering from schizophrenia and borderline mental retardation, was convicted of the premeditated murder of Barbara Ward, also a mentally ill person. Barbara Ward resided before her death at a boarding home in Duluth, which catered to mentally ill individuals needing a supervised living environment. She shared a room there with her boyfriend. Appellant lived in an apartment on Mesaba Avenue in Duluth, about one block away from where Barbara Ward's body was discovered.

On Easter Sunday, April 19, 1987, Ward had lunch at the boarding house and then went to a local drop-in center, which she frequented often to socialize with other individuals and watch television. Seventy-seven other people registered at the drop-in center that day, including appellant. The state produced one witness who testified to seeing Ward speak to appellant at the drop-in center that day. There is no other evidence that the appellant ever knew Ward, and he has consistently denied having any contact with her at all. The drop-in center closed at 5 p.m. on Easter. Appellant was not seen leaving by anyone. Barbara Ward was seen walking away from the center with another man shortly after it closed. She did not return to the boarding house for the evening meal or to take her scheduled 8 p.m. medication.

Later that evening, at about 8:15 p.m., a neighbor saw a man dragging something heavy along the street near the appellant's apartment, and into the alley. It looked to him like a bag or box or large suitcase; he also thought it may have been a body. He could not identify the man, or see where the man might have come from before he first noticed him. From where the neigh-

bor observed this, a half block away, he could see appellant's apartment building, but could not see the entrance to the building because it was blocked by trees. Another neighbor, closer to where Barbara Ward's body was discovered, saw a man in the same alley behind an abandoned church sometime before 10:30 p.m. He was walking back and forth across the alley, and eventually walked away towards Mesaba Ave. She could not identify the man.

Barbara Ward's body was discovered the next morning, Monday, April 20, 1987, near the alley behind the church. It was found in a small alcove by a passerby and was covered by a sheet of plywood, some branches, grass and other debris. Nearby, a plastic garbage bag was found containing a sheet and a bedspread. The bedspread had a knot tied in it and holes were worn through it. Also in the bag, a bristle from a broom was found, which was traced to a broom owned by a neighbor who used it to sweep his driveway. Many of the bristles from his broom were found in the alley.

Ward's clothing was somewhat in disarray. Her shoes were off and her socks were twisted around on her feet. Her brassiere was on normally, but the strap was twisted once in the back. She was not wearing underpants, and her slacks were on backwards, despite the words "front" and "back" written on the waistband.

The pathologist believed the cause of Barbara Ward's death was from suffocation, indicated by cuts in her mouth made by her own teeth. The liver was lacerated, caused by a blow to the abdomen with a blunt object, possibly a knee. The relatively small amount of internal bleeding indicated that the injury was inflicted shortly before death. A large bruise found under the scalp was caused by a sharp blow to the head also inflicted before death by a blunt object, possibly a fist. This blow could have rendered her unconscious. There was no semen present or other evidence of a sexual encounter. There was also no evidence indicating a struggle or any resistance to the assault. The time of death could not be ascertained with certainty, but the pathologist estimated it to be before 2 a.m. on Monday, April 20.

The police investigation of the crime soon began focusing on individuals known to frequent the same places visited by Barbara Ward. Appellant became a suspect when another suspect, Robert Jacobson, told the police that he had seen appellant speaking to Ward at the drop-in center on Easter. The police spoke to appellant several times and noticed that a few days after the murder, he had shaved off his beard. He also had brought some of his suits to a used clothing exchange, including the suit he wore on Easter, the day Barbara Ward was killed. He explained this by saying that he no longer needed any suits, since he was no longer trying to work as a salesman. The suit he wore on Easter was never found by the police.

On April 23, 1987, the appellant returned to his apartment and discovered the police executing a search warrant. He was advised by the police that he was free to leave, but was asked to accompany them to the police station to answer some questions. At the police station, appellant was questioned in an office by two officers for two hours. The police knew that appellant suffered some sort of mental deficiencies and was taking medications under the care of a psychiatrist. They never advised him of his *Miranda* rights, believing that he was not in custody. They also did not tape record or transcribe the interrogation.

According to the police, during the course of the interview, appellant was shown a photograph of the bedspread found near the victim's body and asked if the bedspread belonged to him. Appellant responded that he did not know. After asking the question several more times, and getting the same answer, one of the officers raised his voice against the appellant and feigned anger. The officer later claimed that this was an interrogation technique. The appellant then admitted that the bedspread belonged to him. However, immediately after that police officer left the room, appellant turned to the other officer and said that he admitted ownership of the bedspread only because that is what

the other officer wanted him to say. Appellant's statement was admitted into evidence at trial.[1]

Other evidence at trial showed that the bedspread was identical to approximately 70–100 other bedspreads used by the Lincoln Hotel in Duluth. Appellant lived at that hotel briefly in 1986, but there is no evidence that the appellant removed one of the bedspreads. Many of those bedspreads, however, have disappeared from the hotel over the years. James Chambers testified for the state that he saw a similar bedspread in the appellant's apartment on Mesaba Avenue. He was confused, however, about what period in time he remembered seeing the bedspread in appellant's possession. Other witnesses who had been in the apartment, including the landlord and a roommate, said that the appellant did not have a bedspread. Also, no hair, fiber or body fluids were found on the bedspread to indicate that it belonged to the appellant.

During the search of appellant's apartment, the police removed several hundred hair strands, as well as fiber samples from the carpeting and furniture, cigarette butts, and samples from various surfaces which could possibly have contained blood or body fluids. Paint chips from the porch floor of the building were taken, for comparison with any chips which might have been recovered from the bedspread which was believed to have been used to drag Ward's body out of the apartment. The appellant provided the police with samples of his hair, blood, saliva and semen. This evidence was painstakingly compared against hair, blood and body fluids taken from the victim, and from the sheet and bedspread found nearby. Nothing found in the apartment indicated the victim had been there. Similarly, no evidence was found on the victim, or on the sheet or bedspread which indicated any contact with the appellant or his apartment.

The investigation continued over five months until a grand jury indictment was returned on October 1, 1987. Appellant spoke to the police about the murder approximately seven times. His demeanor was characterized by the police as cooperative and courteous, not guarded or deceptive. He remained in Duluth during the entire investigation, and voluntarily consented to searches of his old and new apartments, voluntarily provided samples of his hair, body fluids and blood to be used in the investigation and he consented to the release of his medical records.

Several months after the murder, the appellant and a friend, Tim Ruelle, were smoking marijuana together. Ruelle testified that appellant blurted out "I did it" and then said "just kidding." Ruelle assumed that this referred to the murder of Ward, although they were not talking about her at the time, and Ruelle admitted to being "high."

The state's theory in this case is that the defendant met Ward at the drop-in center and took her back to his apartment on Mesaba Avenue after the center closed at 5 p.m. He attempted to have sex with her but failed. She then laughed at him, and he became enraged and killed her. Then he wrapped her body in a sheet and bedspread that were in his apartment, dragged her body out of the building across a painted wood porch, and then along the sidewalk on Mesaba Avenue and into the alley behind the church, where he attempted to hide it by placing a piece of plywood and other debris over the body.

The state's evidence to support this theory is thin in several respects. First, there is little evidence that appellant ever knew Barbara Ward. Only one witness testified that he saw appellant speaking to Ward even though there were many people at the drop-in center that day. This witness, Robert Jacobson, was himself a prime suspect in the killing, and the record indicates that about the time he claims to have seen appellant and Ward conversing, Jacobson was suffering from some sort of psychotic episode, and appeared to be delusional.

---

1. Appellant claims that the statement should not have been admitted into evidence because it was not voluntarily made, but was the product of police coercion. Because of our disposition of the case, we need not reach this issue.

Second, some of the state's own witnesses testified to seeing Barbara Ward with other individuals, not appellant, after the drop-in center closed. Eugene Wilfahrt said that he saw Ward walking away from the drop-in center with some other man. Jacobson said he thought he saw her later that day eating supper at the Union Gospel Mission, and that appellant was not there. Another of the state's witnesses thought she saw Ward with another woman in a park two blocks from appellant's apartment building.

Third, there is conflicting evidence that appellant owned the bedspread found near the body. The only witness who testified to seeing the bedspread in appellant's possession had a somewhat cloudy recollection of when he had seen it. His testimony was contradicted by the testimony of one of appellant's old roommates, and his landlord who both said that appellant did not have such a bedspread. Appellant's admission that he owned the bedspread may have been the product of an overly assertive interrogation by the police. No hair strands, fibers or body fluids were found on the bedspread which would indicate that it was ever in appellant's apartment, and the fact that many similar bedspreads could be found in the community controverts the state's assertion that it belonged to appellant.

Fourth, there is a lack of any physical evidence to show that the murder occurred in appellant's apartment despite extensive investigation for such evidence and six weeks of scientific analysis of the evidence taken from the victim and appellant by the Bureau of Criminal Apprehension. And, finally, the state failed to produce any evidence supporting its theory of the motive for the murder. It argued that the victim's clothes were in disarray, indicating that she had been undressed before being killed and redressed post-mortem by appellant. There was some evidence at trial that Ward sometimes had difficulty dressing herself. This is corroborated by the fact that she had the front and back of her slacks labeled. The condition of her clothing and the lack of evidence of a sexual encounter do not "obviously" lead to the conclusion that she was killed after she laughed at appellant for being unable to perform sexually, as the state argues. Viewed as a whole, the state's evidence to support its theory of the case is insubstantial.

Where there is a challenge to the sufficiency of the evidence, our review on appeal is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did. *State v. Martin*, 293 N.W.2d 54, 55 (Minn.1980). Although the conviction in this case was based entirely on circumstantial evidence, such evidence is entitled to as much weight as other kinds of evidence. *State v. Berndt*, 392 N.W.2d 876, 880 (Minn.1986) *cert. denied* 479 U.S. 1046, 107 S.Ct. 909, 93 L.Ed.2d 859 (1987). "A conviction may be based on circumstantial evidence and will be upheld if the 'reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of his guilt.'" *State v. Anderson*, 379 N.W.2d 70, 75 (Minn.1985) *cert. denied* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). The circumstantial evidence must "form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). We recognize that a jury normally is in the best position to evaluate circumstantial evidence, and that their verdict is entitled to due deference. *State v. Berndt*, 392 N.W.2d at 880. However, viewing the evidence in a light most favorable to the conviction, we cannot say that the circumstantial evidence in this case is consistent only with the appellant's guilt, and inconsistent with any other rational hypothesis. *State v. Anderson*, 379 N.W. 2d at 75.

The circumstances in this case which are consistent with the hypotheses of guilt are the facts that the body of the victim was found in the vicinity of the appellant's apartment; he was seen speaking to her

earlier in the day; and his bedspread was found near the victim.[2] Additionally, an unidentified man was seen dragging a heavy object along the sidewalk near the appellant's apartment. After the murder, appellant shaved his beard and gave away some of his clothing, and later made an apparently joking reference to a friend that he "did it."

These circumstances may cast a suspicion of guilt on the appellant, but they in no way exclude other rational inferences which can also be drawn from these circumstances. Other circumstances in this case undercut the state's hypothesis of the appellant's guilt, and support the hypothesis that appellant did not commit the crime. Appellant was not seen with Ward after the drop-in center closed, but she was seen with other individuals. No physical evidence was discovered linking the victim with the appellant or his apartment despite a painstaking investigation for such evidence. No hair, fibers, blood or body fluids were found on the victim, or on the bedspread or sheet to indicate that they had ever been in appellant's apartment. Similarly, no paint flakes were found on the bedspread which would indicate that it was used to drag the victim out of the apartment, across the painted wood porch floor. No blood, body fluids, hair or fibers were found in the apartment to indicate that the victim had ever been there, much less was murdered there and was then redressed by appellant.

 The state also failed to establish any credible motive for the crime.[3] Although a motive is not a necessary element to prove first degree murder, a motive helps form inferences from the circumstantial evidence, and adds credibility to the state's case. *State v. Berndt,* 392 N.W.2d at 879; *State v. Anderson,* 379 N.W.2d at 77. The lack of a credible motive further weakens the inference of guilt to be drawn from the circumstances in this case.

In sum, the state failed to prove first degree murder beyond a reasonable doubt. The circumstantial evidence was not inconsistent with rational hypotheses other than guilt. Because of our disposition of this issue, we need not reach appellant's other assignments of error.

The conviction is reversed.

---

**2.** Although we must accept the evidence in a light most favorable to the conviction, we note again our grave doubts about the reliability of the evidence on these points.

**3.** The state in its cross-examination of appellant and in its final argument to the jury implied that appellant killed Ward because she laughed at him following a failed attempt at sexual intercourse. There is, however, no factual basis supporting this theory. It appears to be mere speculation on the part of the prosecution. The propriety of the state's argument was challenged on appeal, but we need not reach that issue.