*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1895**

State of Minnesota,
Respondent,

vs.

Anne Marie Hinrichs,
Appellant.

**Filed February 1, 2015
Affirmed
Reyes, Judge**

Isanti County District Court
File No. 30CR11542

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Jeffrey R. Edblad, Isanti County Attorney, Deanna N. Natoli, Assistant County Attorney, Cambridge, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jennifer Workman Jesness, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Halbrooks, Presiding Judge; Stauber, Judge; and Reyes, Judge.

# U N P U B L I S H E D   O P I N I O N

**REYES**, Judge

        Appellant argues that insufficient evidence supports her convictions of neglect of a child, neglect of a vulnerable adult, and malicious punishment of a child. We affirm.

## FACTS

In 1997, appellant Anne Marie Hinrichs and her husband at the time, Norm Duren, provided foster care for Duren's three grandchildren, N.D., T.D., and F.D. Duren's grandchildren were removed from the care of their biological parents because of allegations of physical abuse. There were also indications that the children's biological mother drank alcohol and used drugs while she was pregnant with each child. At the time of this foster-care placement, appellant and Duren were living in North Branch, Minnesota.

In 1999, appellant and Duren divorced, and Duren moved out of the North Branch home. Pursuant to an agreement between appellant and Duren, all three children remained in appellant's care. Thereafter, Duren had little to no contact with his grandchildren. Around this time, appellant also began receiving funding from the county for personal care assistants (PCAs) to provide care for the eldest child, N.D. Bob Carroll, appellant's then-boyfriend, moved into the North Branch home. Appellant formally adopted Duren's three grandchildren in 2000. Later that same year, appellant married Carroll.

In April 2001, when F.D. was in second grade, appellant and Carroll requested that F.D. complete a special-education assessment. The resulting report recommended general education for F.D. Appellant and Carroll notified F.D.'s school district that they did not agree with the report's conclusions and had F.D. participate in a neuropsychological evaluation through the University of Minnesota. A report from the University of Minnesota following the evaluation diagnosed F.D. with a series of mental-

2

health disorders, including mood disorder, reactive-attachment disorder, and attention-deficit-hyperactivity disorder. Based on that report, F.D.'s school district agreed that she was a student with special needs and began providing her with one-on-one paraprofessional services.

In 2008, Carroll left the North Branch home, and appellant and Carroll divorced in 2009. In February 2009, appellant and the children moved to Ogilvie, Minnesota. F.D. transferred to Ogilvie High School on April 1, 2009, when she was in the tenth grade.

Appellant operated both the North Branch and Ogilvie homes with extremely rigid rules.[1] By fall 2003, appellant had installed cameras in the children's bedrooms in the North Branch home. Appellant later instituted similar surveillance in the Ogilvie home. Additionally, by 2003, PCA services had been expanded to include all three children. F.D. was monitored by the PCAs at all times while she was at home, except when she was sleeping. Appellant required the PCAs to monitor F.D. when she went to the bathroom and while she showered. F.D. was not permitted to use the bathroom at night unmonitored. Appellant installed an alarm system, which alerted her if F.D. used the bathroom at night. If F.D. woke appellant, appellant would yell at F.D., so F.D. felt as though she could not use the bathroom and would often wet the bed. Additionally, F.D.

---

[1] N.D. was alleged to exhibit inappropriate sexualized behavior. T.D. was alleged to have a propensity to eat non-food items, engage in self harm, and display violent behavior. The district court found that appellant's surveillance and punishment regime may have been appropriate for F.D.'s siblings but was wholly inappropriate when applied to F.D.

was constantly monitored by a paraprofessional while at school. Finally, appellant closely monitored and controlled F.D.'s food intake, both at home and at school.

Appellant required F.D. to complete various writing assignments, which were called "sentences," "ABCs," and "plans." "Sentences" consisted of writing the same sentence several times in an effort to reinforce the message contained in the sentence. "ABCs," which stands for antecedent, behavior, consequence, were implemented to help F.D. understand what conduct would trigger certain outcomes. Finally, "plans" were similar to ABCs but were more forward looking, as the focus was for F.D. to contemplate how she could avoid bad behavior in the future.

On February 11, 2011, staff at Ogilvie High School reported suspected abuse of a vulnerable adult to the county. On February 15, 2011, F.D. was removed from appellant's care and placed with a local foster-care provider. Following a twelve-day court trial, the district court found appellant guilty of felony neglect of a child, in violation of Minn. Stat. § 609.378, subd. 1(a)(1) (2002), for conduct that began on or about May 14, 2003, and continued through F.D.'s eighteenth birthday on October 11, 2010; gross-misdemeanor criminal neglect of a vulnerable adult, in violation of Minn. Stat. § 609.233, subd. 1 (2010), for conduct that occurred from October 12, 2010, and continued through February 14, 2011; and gross-misdemeanor malicious punishment of a child, in violation of Minn. Stat. § 609.377, subd. 1 (2002), for conduct that began on or about May 14, 2003, and continued through October 11, 2010. This appeal follows.

**D E C I S I O N**

**I.** **Sufficient evidence supports appellant's convictions of neglect of a child and neglect of a vulnerable adult.**

Appellant argues that there is insufficient evidence to support the district court's conclusion that she neglected F.D. by willfully depriving F.D. of food. Appellant admits that she closely monitored and controlled F.D.'s diet and used food as a disciplinary tool. However, appellant contends that she never denied F.D. food or intentionally starved her, that F.D.'s dislike for bologna sandwiches did not render appellant's actions criminal, and that doctors never advised appellant that F.D. was malnourished. We are not persuaded.

When reviewing a claim of insufficient evidence, we thoroughly review the record to determine whether the evidence establishes guilt beyond a reasonable doubt. *See State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). We view facts in the light most favorable to the conviction and assume that the district court "believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). A conviction may be reversed only if we conclude that the fact-finder acted without due regard for the presumption of innocence and the necessity of overcoming that presumption by proof beyond a reasonable doubt. *State v. Formo*, 416 N.W.2d 162, 164-65 (Minn. App. 1987), *review granted* (Minn. Feb. 17, 1988) *and appeal dismissed* (Minn. July 28, 1988). The same standard applies to cases heard by a jury as to cases heard before a court. *State v. Totimeh*, 433 N.W.2d 921, 924 (Minn. App. 1988), *review denied* (Minn. Feb. 22, 1989).

A legal guardian is guilty of neglect of a child if she "willfully deprives a child of necessary food, clothing, shelter, health care, or supervision" when she "is reasonably able to make the necessary provisions and the deprivation harms or is likely to substantially harm the child's physical, mental, or emotional health." Minn. Stat. § 609.378, subd. 1(a)(1). Under the statute, "willfully" is interpreted as "an aggravated form of negligence," similar to "intentionally." *State v. Cyrette*, 636 N.W.2d 343, 348 (Minn. App. 2001), *review denied* (Minn. Feb. 19, 2002). A caregiver is guilty of neglect of a vulnerable adult if she "intentionally neglects a vulnerable adult or knowingly permits conditions to exist that result in the abuse or neglect of a vulnerable adult." Minn. Stat. § 609.233, subd. 1. "Neglect" under the vulnerable adult statute is the "failure to provide a vulnerable adult with necessary food, clothing, shelter, health care, or supervision." *Id.*

There is sufficient evidence in the record to support the district court's conclusion that appellant deprived F.D. of food. Appellant placed locks on the basement freezer in both the North Branch and Ogilvie homes to keep F.D. and her siblings out. Appellant herself testified that there was a video camera monitoring the kitchen in the Ogilvie home. Testimony from PCAs and F.D.'s Ogilvie paraprofessional confirmed that appellant used food as punishment and that food restrictions were imposed on F.D. Moreover, almost all of F.D.'s bad behavior at school was related to food. The district court appropriately inferred from this evidence that F.D. was deprived of food and was often hungry at school.

6

Appellant further asserts that the district court made the contradictory conclusions that appellant provided F.D. with a satisfactory amount of food and that F.D. rarely went without dinner, but that appellant deprived F.D. of food. However, the district court's finding that appellant provided "minimal and repetitive but satisfactory" food was regarding only F.D.'s bag lunches. This finding did not relate to all of F.D.'s meals or to the totality of food F.D. received on a daily basis.

Additionally, appellant argues that there was significant contradictory testimony regarding the evening meal. F.D. testified that she was given three bologna sandwiches a day "quite a bit" despite the fact that she did not like bologna and appellant was aware of this fact. Testimony from F.D.'s PCAs and paraprofessionals indicated that this may have been true on some days. The court's decision to credit each version of events as having occurred on some days but not others was appropriate. The district court further found that appellant served F.D. bologna sandwiches for breakfast as punishment, even though she was also given bologna sandwiches for lunch almost daily. This finding is also supported by the record.

F.D.'s treating physician testified that providing F.D. with a bologna sandwich for three meals a day would not be considered providing her with necessary food because such a diet would not meet her basic nutritional needs. At an appointment with that same physician on February 17, 2011, F.D. weighed 96 pounds and had a body-mass index (BMI) of 17.5. A healthy BMI is between 18.5 and 25. The physician diagnosed F.D. as malnourished. The physician also diagnosed F.D. with amenorrhea, an abnormal absence of menstruation. These are related conditions. Viewing the evidence in the light most

favorable to the verdict, the evidence is sufficient to support appellant's convictions of neglect of a child and neglect of a vulnerable adult based on the deprivation of food. Because the applicable statutes require only the deprivation of either food *or* shelter, we do not address appellant's arguments regarding the deprivation of shelter. Minn. Stat. § 609.233, subd. 1, .378, subd. 1(a)(1).

## II. Sufficient evidence supports appellant's conviction of malicious punishment of a child.

Appellant argues that the evidence was insufficient to support the district court's conclusion that the writing assignments appellant imposed on F.D. were cruel and excessive under the circumstances. Appellant asserts that the writing assignments were "tools to help F.D. gain insight into and stop her negative behaviors." We disagree.

Malicious punishment of a child occurs when a legal guardian by "an intentional act or a series of intentional acts with respect to a child, evidences unreasonable force or cruel discipline that is excessive under the circumstances." Minn. Stat. § 609.377, subd. 1. In cases of malicious punishment of a child, all relevant circumstances must be analyzed when determining whether discipline was unreasonable or excessive. *See In re Welfare of Children of N.F.*, 735 N.W.2d 735, 738–39 (Minn. App. 2007), *aff'd in part*, *rev'd in part on other grounds*, 749 N.W.2d 802 (Minn. 2008). Relevant circumstances include the child's age, height, and weight; the seriousness of the child's "infraction;" the degree of force used by the guardian; and the physical impact of the discipline. *See id.* But physical abuse is not required for a finding of guilt under Minn. Stat. § 609.377,

subd. 1.  *State v. Broten*, 836 N.W.2d 573, 577 (Minn. App. 2013), *review denied* (Minn. Nov. 12, 2013).  Emotional harm is enough.  *Id.*

After carefully reviewing all of the evidence presented, we find that the district court's conclusion that appellant's writing assignments were excessive and cruel is reasonable and supported by sufficient evidence.  Appellant required F.D. to complete various writing assignments as punishment for misbehavior.  Appellant would determine how many writing assignments F.D. was required to complete.  Though the number of required writing assignments varied from day to day, the record indicates that appellant was required to complete some form of writing assignment almost daily.  The writings had word requirements, and appellant instructed the PCAs to accept only sentences that were legible.  If the writings were illegible, F.D. would be required to complete additional writings.  There were days when F.D. would be doing her writing exercises from the time she got home from school at around 3:30 p.m. until 7:30 p.m., with only a short break for dinner.  F.D. was required to write with a crayon, and if the crayon broke, a new crayon was not provided.  In addition, F.D. would sometimes be required to write with a sock over her hand, making it even more difficult for F.D. to write legible sentences.

This conduct occurred over the course of seven years, beginning when F.D. was ten years old.  Appellant's primary infractions were wetting the bed[2] and trying to sneak

---

[2] F.D. was not permitted to use the bathroom for any purpose, at any time, without being monitored.  This included use of the bathroom at night.  To ensure compliance with this rule, appellant installed alarms on the children's bedroom doors so that she would be alerted if they left their bedrooms.  Appellant would yell when awoken by these alarms.

food.[3]  While the assignments did not require appellant to exert physical force, and the punishment did not cause F.D. physical harm, the assignments did cause F.D. emotional harm.

Appellant attempts to distinguish the instant case from other cases prosecuted under Minn. Stat. § 609.377, subd. 1.  However, the cases appellant cites are inapposite. *Broten*, 836 N.W.2d at 578 (affirming malicious-punishment conviction where parents shaved daughter's head, forced her to wear a tank top and diaper, and required her to run around outside in front of a crowd of people); *N.F.*, 749 N.W.2d at 805 (discussing parent's striking child with a wooden paddle 36 times but in the context of a child-protection order).  While appellant's conduct may have involved less severe physical abuse than that inflicted in other malicious-punishment cases, the abuse inflicted by appellant is more severe in the length of time over which the punishment occurred.  As previously noted, the district court found, and appellant does not dispute, that the writing assignments began on or about May 14, 2003, and continued through October 11, 2010. Furthermore, appellant's position fails to account for Dr. Rori Johnson's testimony that she did not intend for appellant to implement the repetitive writing assignments in the manner she did, and that the way appellant implemented the assignments would be

---

F.D. therefore felt confined to her room and would often wet the bed rather than wake appellant.

[3] The district court found that F.D.'s behavioral problems related to food were because she was constantly hungry as a result of not being given enough to eat.  This finding is supported by the record, as there was testimony that F.D. would take food out of the garbage and steal food at school.

considered punitive.  When viewed in the light most favorable to the verdict, the evidence is sufficient to support appellant's conviction of malicious punishment of a child.

**Affirmed.**