*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0851**

State of Minnesota,
Respondent,

vs.

Senen Guerrero,
Appellant.

**Filed March 28, 2016
Affirmed
Larkin, Judge**

Pennington County District Court
File No. 57-CR-14-712

Lori Swanson, Attorney General, Edwin W. Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

Alan G. Rogalla, Pennington County Attorney, Thief River Falls, Minnesota (for respondent)

Barry S. Edwards, Barry S. Edwards Law Office, Minneapolis, Minnesota; and

Max A. Keller, Keller Law Offices, Minneapolis, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Hooten, Judge; and Kalitowski, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his two convictions of third-degree criminal sexual conduct, arguing that the evidence at his jury trial was insufficient to support the jury's guilty verdicts. We affirm.

## FACTS

In 2014, respondent State of Minnesota charged appellant Senen Guerrero with two counts of third-degree criminal sexual conduct and three counts of fifth-degree criminal sexual conduct. The case was tried to a jury over four days. The victim, C.A., testified that Guerrero was a friend of C.A.'s family, coached C.A. and her brother in soccer, worked at the same grocery store as C.A., and took classes at the same community college as C.A. C.A. trusted Guerrero and thought of him as a father. Guerrero teased C.A. about being the "naughty" child in her family and repeatedly asked her when she would turn 18.

In the spring and summer of 2014, after C.A.'s 18th birthday, Guerrero and C.A. met alone several times. Guerrero was 44 years old at the time. Guerrero told C.A. that he was having problems with his wife and family. He drove C.A. to secluded areas. On one occasion, Guerrero drove C.A. to a forested area with no nearby residences, turned off the car and lights, and repeatedly asked C.A. to be his girlfriend, even after she said no. Guerrero later told C.A. he was joking, but C.A. testified, "I was scared because I realized that we were alone and that if he wants to do something to me he could." During another trip, C.A. began crying because of issues at work, and Guerrero moved into her seat, put her legs over his, put his arm around her, and began kissing her neck and lips. C.A. told

Guerrero that she would tell her father if he did not stop, and Guerrero "kind of freaked out," according to C.A. On a third trip, Guerrero induced C.A. to enter his car by falsely claiming he had her parents' permission, after C.A.'s parents had instructed her not to go on any rides with Guerrero.

The incident underlying the first count of third-degree criminal sexual conduct occurred in May 2014. C.A. had planned to meet Guerrero at the community college, but when she arrived, Guerrero told her to meet him at an empty parking lot five minutes away. Guerrero was angry with C.A. because her father had talked to him.[1] Initially, C.A. was frightened and refused to enter Guerrero's car, but she eventually got in because Guerrero would not speak to her otherwise. Guerrero asked C.A. about her pubic hair, and C.A. told him it was none of his business. Guerrero continued to ask detailed questions about C.A.'s pubic hair, even though he had told her that he would stop if she answered. Guerrero then touched C.A. between her legs, put his hand inside her pants, and inserted his fingers into her vagina. C.A. testified that she told Guerrero to stop, in one way or another, five times. Guerrero himself testified that C.A. said no at least four times. C.A. testified that Guerrero did not listen to her, that saying "no" meant nothing to him, and that he was not going to let her go. C.A. also testified that she did not feel like she could leave.

After that incident, Guerrero started having one-on-one soccer practices with C.A. At the first practice, Guerrero asked C.A. if she wanted to repeat the events in the parking lot and whether she wanted to stay a virgin. Guerrero rubbed himself against C.A. until

---

[1] At trial, C.A.'s father testified that he had asked Guerrero "not [to] take [C.A.] for any other rides."

she stepped away. C.A. told Guerrero she did not want him rubbing against her. Later, Guerrero invited C.A. to practice soccer with him and his children, but when C.A. arrived, Guerrero was alone. Guerrero hugged C.A., rubbed himself against her, and touched her.

At another one-on-one practice, Guerrero hugged C.A. and would not let her go, even after she asked him to and tried to pull his arms apart. Guerrero rubbed himself against C.A. and grabbed her buttocks. C.A. twice told Guerrero to stop. Guerrero exposed his penis to C.A. and followed her to her car. Guerrero sat on the door frame of C.A.'s car and told her that she could help him by touching him and letting him touch her. Guerrero once again exposed his penis and asked C.A. to grab it. C.A. refused, and Guerrero told C.A. that this was how she could help him. During this incident, C.A. answered a cellular phone call from her brother, but she did not mention Guerrero because she was afraid that Guerrero might hurt her or "do whatever he wanted" if she mentioned his name. C.A. testified that she felt like Guerrero was not going to leave unless she did as he said. After C.A. briefly touched Guerrero's penis, he masturbated next to her for two to three minutes. When Guerrero left, he told C.A. that he felt bad and was going home to read his Bible.

The incident underlying the second count of third-degree criminal sexual conduct occurred on June 15. Guerrero texted C.A. that he needed to talk to her about something bad, that he could only tell C.A. what was going on in person, and that if she did not meet him, she would never see him again. C.A. testified that she agreed to meet Guerrero because she was "really scared that he was going to kill himself." C.A. testified, "I didn't know what was going to happen, and . . . I was really nervous that something bad was going to happen to me either at work or in the future."

4

When C.A. arrived at the meeting location, she got into Guerrero's car. Guerrero began touching C.A.'s legs and shirt. C.A. told him to stop and to move his hands. When C.A. started to leave, Guerrero gave her a hug and kissed her neck and chest. C.A. twice asked him to stop. Guerrero continued to kiss her until his cellular phone rang. C.A. got out of Guerrero's car and into her car. She testified that she felt like she could not leave. Guerrero got into C.A.'s car and asked if she liked how he had been kissing her. C.A. told Guerrero that she did not like it. Guerrero responded that C.A. did like it and that she would like it. Guerrero reclined C.A.'s seat and kissed her neck. C.A. asked Guerrero to stop. Guerrero pushed up C.A.'s shirt and kissed her breasts. C.A. asked Guerrero to stop. Guerrero inserted his fingers into C.A.'s vagina. C.A. asked Guerrero to stop. Guerrero asked C.A. to take her pants off and began performing cunnilingus on C.A. C.A. testified that she "just sat there" because she "knew that he wouldn't let [her] go until he did whatever he wanted to do." Guerrero started masturbating beside C.A. After about an hour, Guerrero said that he did not have time for this anymore, that C.A.'s parents were going to be upset with her, and that he had to leave. C.A. began to cry, and Guerrero left.

Approximately one hour later, Guerrero texted C.A. Guerrero said that he was sorry and asked C.A. if she was okay. When C.A. said she felt sick and worthless, Guerrero responded, "Don't that will not happen again ever I promise I will kill [myself] first is not fair." He later texted, "Well if you don't forgive me I will feel like killing [myself] I can't believe I made you do all that is not right you and your family really care about me I'm sorry." He also texted, "[Y]ou need to tell me you forgive me I'm going to start reading

5

the [B]ible right now. . . . OK if you can't forgive me I will have to do what I got to do I'm sorry."

After the state presented its case, Guerrero moved for a judgment of acquittal, and the district court denied the motion. The trial continued, and Guerrero testified on his own behalf. The jury found Guerrero guilty of all five charges and the district court imposed executed prison sentences for the third-degree criminal sexual conduct offenses. Guerrero appeals.

## D E C I S I O N

Guerrero contends that there was insufficient evidence for the jury to find him guilty of third-degree criminal sexual conduct.[2] When considering a claim of insufficient evidence, this court carefully analyzes the record to determine whether the evidence, viewed in the light most favorable to the conviction, was sufficient to allow the jury to reach its verdict. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). Because a jury is in the best position to evaluate the credibility of witnesses and weigh evidence, we give a jury verdict "due deference." *State v. Brocks*, 587 N.W.2d 37, 42 (Minn. 1998). We assume the jury was persuaded by the evidence supporting the conviction, especially "where

---

[2] Guerrero also argues that the district court erred by denying his motion for judgment of acquittal. The standard for ruling on a motion for a judgment of acquittal is whether the evidence is sufficient to sustain a conviction of the offense. Minn. R. Crim. P. 26.03, subd. 18(1)(a) (stating that a "defendant may move for . . . a judgment of acquittal on one or more of the charges if the evidence is insufficient to sustain a conviction.") Because that standard is identical to Guerrero's sufficiency-of-the-evidence claim, we do not separately consider whether the district court erred by denying Guerrero's motion. *See State v. Simion*, 745 N.W.2d 830, 841 (Minn. 2008) ("A motion for judgment of acquittal is properly denied where the evidence, viewed in the light most favorable to the State, is sufficient to sustain a conviction." (citing *State v. Slaughter*, 691 N.W.2d 70, 75 (Minn. 2005))).

6

resolution of the case depends on conflicting testimony because weighing the credibility of witnesses is the exclusive function of the jury." *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

"A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the third degree if . . . (c) the actor uses force or coercion to accomplish the penetration." Minn. Stat. § 609.344, subd. 1(c) (2014). Guerrero does not deny that he engaged in sexual penetration with C.A. But he argues that the state did not prove that he used force or coercion to accomplish the penetration. The state notes that it did not rely on a "force" theory at trial and that "[o]nly the coercion form of [the] offense is at issue in this case." We therefore focus our review on the coercion element.

"Coercion" is defined as

> the use by the actor of words or circumstances that cause the complainant reasonably to fear that the actor will inflict bodily harm upon the complainant or another, or the use by the actor of confinement, or superior size or strength, against the complainant that causes the complainant to submit to sexual penetration or contact against the complainant's will.

Minn. Stat. § 609.341, subd. 14 (2014). "Bodily harm" is defined as "physical pain or injury, illness, or any impairment of physical condition." Minn. Stat. § 609.02, subd. 7 (2014). "Proof of coercion does not require proof of a specific act or threat." Minn. Stat. § 609.341, subd. 14. Nonetheless, Guerrero's appellate argument focuses on the lack of specific threats. He argues that "[t]here was no threat to injure [CA] or another person." He emphasizes that he never said he would hurt C.A., C.A. never testified that he threatened her or anyone else, and "nobody has alleged that [he] threatened to harm anyone." Guerrero's focus on the lack of specific threats is unavailing. *See id*.

For the purpose of third-degree criminal sexual conduct, "[t]here is evidence of coercion where an abuser intentionally creates an atmosphere of fear." *State v. Gamez*, 494 N.W.2d 84, 87 (Minn. App. 1992), *review denied* (Minn. Feb. 23, 1993). For example, in *State v. Carter*, the supreme court concluded that there was sufficient evidence to find the defendant guilty of third-degree criminal sexual conduct, even though the defendant did not use actual force or verbally threaten force. 289 N.W.2d 454, 455 (Minn. 1979). The supreme court noted that the defendant was 20 years older than the 15-year-old victim and that he drove the victim to an isolated area and "intentionally created an atmosphere of fear which caused [the victim] to finally submit to his sexual advances." *Id.* Minnesota

8

courts have found sufficient evidence of coercion in several other cases based on an atmosphere of fear. *See, e.g.*, *State v. Erickson*, 313 N.W.2d 16, 17-18 (Minn. 1981) (defendant offered a ride to young woman, drove her into the country, told her she had no choice but to submit, made facial expressions, and referred to a knife); *Gamez*, 494 N.W.2d at 87 (defendant continued sexual advances after victim told him to stop, pulled up victim's nightgown, and held victim down during sexual assault); *State v. Daby*, 359 N.W.2d 730, 733 (Minn. App. 1984) (victim rebuffed defendant's advances, defendant pulled victim into truck, victim continued to refuse but eventually gave in to avoid additional physical harm).

Although some of the atmosphere-of-fear cases involve stronger evidence of coercion, we are satisfied that the underlying concept applies here. Viewing the evidence in the light most favorable to the verdict, the jury could have reasonably concluded that Guerrero created an atmosphere that caused C.A. to reasonably fear bodily harm and to therefore submit to his demands. During the May incident, Guerrero changed the planned meeting location at the last minute from a college campus to an empty parking lot. He was angry with C.A. because her father had talked to him about "not tak[ing] [C.A.] for any other rides," and he refused to talk to C.A. until she got in his car. Guerrero asked C.A. intrusive questions about her pubic hair and told her that he would stop if she answered. But once C.A. answered, Guerrero persisted with even more intrusive questions. Guerrero then touched C.A. sexually and ignored her repeated demands for him to stop. C.A. testified that she was frightened by Guerrero and felt like she could not leave.

Before the June 15 incident, Guerrero convinced C.A. to meet him by telling her that something bad had happened and insisting that he needed to talk to her in person. Guerrero implied that that he would kill himself if C.A. did not meet him that day—an implication reinforced by Guerrero's subsequent text messages in which he referred to suicide at least two times. Once C.A. got into Guerrero's car, Guerrero touched her sexually and refused to stop even though she repeatedly told him to stop. C.A. testified that she felt like she could not leave. Guerrero told C.A. that she was going to like him kissing her and continued to touch C.A. sexually despite her objections.

When viewed in the light most favorable to the verdict, C.A.'s testimony regarding Guerrero's actions and her resulting perceptions was sufficient to establish a coercive atmosphere of fear. And the circumstances justified C.A.'s perceptions. Guerrero was 26 years older than C.A. He took C.A. to secluded areas and was increasingly physical and sexual with her, even though she protested. C.A. believed that "no" meant nothing to Guerrero. When C.A. indicated that she did not want to see Guerrero, Guerrero lied and told her that other people would be present, that he had her parents' permission, or that they would meet in public.

In arguing that the evidence does not show coercion, Guerrero relies on his own testimony and downplays C.A.'s testimony. But when considering the sufficiency of the evidence, this court must assume the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Lanam*, 459 N.W.2d 656, 662 (Minn. 1990). "This is especially true where resolution of the case depends on conflicting testimony, because

weighing the credibility of witnesses is the exclusive function of the jury." *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980).

Guerrero also argues that the state's evidence was insufficient because the state did not corroborate C.A.'s testimony. In a prosecution for criminal sexual conduct, the testimony of a complainant need not be corroborated. Minn. Stat. § 609.347, subd. 1 (2014). But "the absence of corroboration in an *individual* case may well call for a holding that there is insufficient evidence upon which a jury could find the defendant guilty beyond a reasonable doubt." *State v. Ani*, 257 N.W.2d 699, 700 (Minn. 1977) (quotation omitted).

Guerrero argues that corroboration is necessary in this case because C.A. did not immediately report the assaults and she rebuffed her parents' involvement in the matter. He argues that C.A. was "seemingly coached by the prosecution" and that C.A.'s parents and religious counselors convinced her that she was coerced. However, C.A.'s reports regarding the incidents were consistent. *See State v. Folley*, 378 N.W.2d 21, 25 (Minn. App. 1985) (detailed and consistent description of sexual abuse is important factor in corroborating victim's testimony). And C.A. testified that she was crying and distraught after the June 15 incident. C.A.'s text messages to Guerrero and a recorded conversation between C.A. and Guerrero corroborated her emotional state. *See State v. Mosby*, 450 N.W.2d 629, 635 (Minn. App. 1990) (stating that victim's emotional state after assault provides corroboration), *review denied* (Minn. Mar. 16, 1990). Finally, Guerrero acknowledged that C.A. told him to stop his sexual advances and that he ignored her requests. In sum, assuming without deciding that corroboration is necessary, the state presented sufficient evidence to corroborate C.A.'s testimony.

11

In conclusion, we acknowledge that this may have been a close case. But whether Guerrero caused C.A. to reasonably fear bodily harm and to therefore submit to sexual penetration against her will was for the jury to decide. The jury was in the best position to determine whether Guerrero's behavior—much of which is undisputed—resulted in coercion sufficient to convict Guerrero of third-degree criminal sexual conduct. *See Brocks*, 587 N.W.2d at 42 ("The jury is in the best position to evaluate the credibility of witnesses and weigh the evidence, and therefore its verdict must be given due deference."). We are mindful of the jury's opportunity to observe the testimony of Guerrero and C.A. firsthand, and we must defer to its assessment of their relative credibility. *See Pieschke*, 295 N.W.2d at 584 ("[W]eighing the credibility of witnesses is the exclusive function of the jury."). Moreover, our standard of review requires us to view the evidence in a light most favorable to the verdict. *Webb*, 440 N.W.2d at 430. Under that standard, we are satisfied that the jury could reasonably conclude, beyond a reasonable doubt, that Guerrero was guilty of third-degree criminal sexual conduct. We therefore do not disturb the jury's verdict.

**Affirmed.**