*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0767**

State of Minnesota,
Respondent,

vs.

James Michael Peterson,
Appellant.

**Filed May 13, 2024**
**Affirmed**
**Bratvold, Judge**

St. Louis County District Court
File No. 69DU-CR-19-3571

Keith Ellison, Attorney General, Jacob Campion, Assistant Attorney General, St. Paul, Minnesota; and

Kimberly J. Maki, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Paul J. Maravigli, Special Assistant Public Defender, Minneapolis, Minnesota (for appellant)

        Considered and decided by Connolly, Presiding Judge; Bratvold, Judge; and Florey, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**BRATVOLD**, Judge

In a direct appeal, appellant challenges his conviction for aiding and abetting second-degree murder. Witnesses reported hearing a gunshot, which was recorded at 1:47 a.m. Shortly after, law enforcement found the victim sitting inside his pickup truck with a gunshot wound; he later died. No witness testified to seeing the murder or to seeing appellant at the scene. The murder weapon was not recovered. But detailed testimony described appellant with a gun driving toward the victim to confront him. Appellant challenges the sufficiency of the circumstantial evidence to sustain his conviction. Because the record evidence is consistent with guilt and inconsistent with any rational hypothesis except that of guilt, we affirm.

## FACTS

On September 27, 2019, respondent State of Minnesota charged appellant James Michael Peterson with aiding and abetting second-degree murder under Minn. Stat. § 609.19, subd. 1(1) (2018). Most of the events included in the state's case against Peterson took place in Duluth and involved four people: T.N., the murder victim; T.N.'s friend, J.S., with whom he decided to buy drugs; C.B., the drug dealer; and Peterson, C.B.'s friend.

Before considering the evidence offered against Peterson, some background is helpful. The following diagram provides an approximate layout of the relevant area and is based on the record.



One of the key locations in the state's case is C.B.'s house, which is located on 62nd Avenue south of Bristol Street near to where 62nd Avenue begins to curve east. Law enforcement found T.N. with a gunshot wound, sitting inside his pickup parked on 62nd Avenue just north of Bristol Street.

Four surveillance cameras provided time-stamped recordings of some events, and the recordings were admitted at trial.[1] The first camera was installed on a house located on Green Street and surveilled the intersection with 62nd Avenue (Green Street camera). The second camera surveilled Interstate 35's Cody Street exit (Cody exit camera). The third camera surveilled the parking lot of a convenience store in Proctor (convenience-store camera). And the fourth camera was installed on a house on 61st Avenue (61st Avenue camera). Relevant to the issues in this appeal, the fourth camera recorded the sound of a gunshot at 1:47 a.m.

***Before the Shooting***

On September 21, 2019, J.S. and her "good friend" T.N. were hanging out in and around Duluth. They decided to buy drugs and drove T.N.'s Chevrolet pickup truck to C.B.'s home on 62nd Avenue. J.S. had known C.B. "[a] few months," but T.N. did not know C.B. The Green Street camera showed T.N.'s pickup driving south on 62nd Avenue toward C.B.'s house at 12:46 a.m.

T.N. parked "a couple blocks away" from C.B.'s house and told J.S. he would wait in the pickup. J.S. "walked up alone and met up with" C.B. Then, J.S. got in C.B.'s silver Hyundai Elantra—a "little car" with "[l]oud exhaust." The Green Street camera showed

---

[1] The transcript shows that the jury viewed the recordings, which were embedded in a PowerPoint. The PowerPoint is in the record on appeal, but the record does not include the recordings. The PowerPoint shows the recordings as still photos with a time stamp. The time stamps include the hour, minute, and second (e.g., 12:10:45); for readability, we round times to the nearest minute.

C.B.'s car driving west on Green Street.[2] J.S. and C.B. drove a few blocks to a dirt road and parked for about 15 or 20 minutes to complete the drug sale and use methamphetamine.

While C.B. and J.S. were parked, T.N., who was on foot, "came running out of nowhere" and tried to "pull [C.B.] out of the vehicle." T.N. said something like, "Give me all your sh-t." C.B. "got out of the car and punched" T.N., and "then [T.N.] ran back off." T.N. "didn't actually get anything from" C.B. during this encounter. C.B. asked J.S. if she knew who attacked him, and J.S. said, "[Y]es, that's my ride." C.B. "kind of chuckled" and said, "[W]e'll take care of it."

At 1:26 a.m., J.S. texted T.N., "Your f--king stupid as f--k. Why would you do that?" At 1:27 a.m., she texted him again, "Thanks a lot. You made me look like a f--king joke." At 1:28 a.m., the Green Street camera showed T.N.'s pickup traveling north on 62nd Avenue toward Green Street—driving away from C.B.'s house.

C.B. and J.S. drove back to C.B.'s house. C.B. "went inside his house, and he came back out with the shotgun," and "Peterson was following behind him." C.B. "got back into the driver's seat" of the silver sedan, and Peterson "got in the seat behind [J.S.]" They asked J.S. to call T.N.

A call log from T.N.'s phone showed that J.S. called T.N. twice at 1:31 a.m. Over J.S.'s speakerphone, T.N. "proceeded to apologize repeatedly" to C.B. and said that "he

---

[2] At trial, an investigator testified that the car that appeared on the surveillance-camera recordings had characteristics "consistent with the overall key characteristics of [C.B.'s] vehicle." The license-plate number was not visible in the recordings. The investigator testified that C.B.'s sedan and the sedan in the recordings were both silver, had rust near the driver's side rear wheel well, had rectangular sidelights, had taillights angled diagonally toward the trunk, were marked by a stripe along each side, and had no hubcaps on any tire.

had no idea that it was" C.B. and J.S. when he ran up. C.B. was "too calm" and asked T.N. to "meet up and talk." T.N. agreed to meet and stated that J.S. knew where he was parked. At 1:35 a.m., the Green Street camera showed T.N.'s pickup traveling south on 62nd Avenue towards Bristol Street and in the direction of C.B.'s house.

C.B. "started to drive" and "handed the gun" to Peterson. C.B. told J.S. he "didn't want [her] to be there for it." J.S. wanted to be dropped off at a convenience store in Proctor because she "was going to Cloquet for the night, and that's where [she] was getting picked up from."

On the drive to the convenience store, C.B. or Peterson said he "wondered if [J.S.] had [T.N.'s] parents' number because somebody would need to know where the body was." Then C.B. and Peterson "both kind of chuckled." The Green Street camera showed C.B.'s car driving west on Green Street toward Interstate 35 (I-35) at 1:37 a.m. About one and a half minutes later, the Cody exit camera showed C.B.'s car entering the interstate from Cody Street.

The convenience-store camera showed C.B.'s car entering the parking lot at 1:40 a.m. C.B. parked in an area that was not well lit, telling J.S. that he "thought that there wouldn't be as [many] cameras, or that they wouldn't be seen as well." J.S exited the car, and C.B. and Peterson "drove off." The convenience-store camera showed C.B.'s car leaving at 1:41 a.m.

J.S. then immediately spoke with T.N. on the phone. The call log from T.N.'s phone showed that T.N. called J.S. twice at 1:41 a.m. J.S. "begged [T.N.] to leave where he was

6

parked" and told him that she "didn't think it was going to turn out good." At the end of the call at 1:43 a.m., T.N. told J.S. that he saw "headlights and he assumed it was them."

The Cody exit camera showed C.B.'s car exiting I-35 onto Cody Street at 1:43 a.m. About one and a half minutes later, the Green Street camera showed two occupants in C.B.'s car turning from Green Street onto 62nd Avenue, at first swerving into the oncoming lane, then correcting and driving south toward where T.N. was parked on 62nd Avenue just north of Bristol Street.

### *The Shooting*

The 61st Avenue camera recorded the sound of a gunshot at 1:47 a.m. Five neighbors on 62nd Avenue and Bristol Street testified about what happened before and after the gunshot. Four of the neighbors testified to hearing voices yelling and arguing followed by a gunshot; two neighbors testified to hearing a five-minute argument. Two of the neighbors testified to hearing a car with "a worn-out muffler" and "loud exhaust" "speed away" after the gunshot; two other neighbors testified to seeing a large SUV speed south on 62nd Avenue after the gunshot. One neighbor was not asked about whether they heard or saw a vehicle driving away.

Duluth law enforcement responded to the report of a shooting, arrived at the scene at 1:51 a.m., and found T.N. "sitting in the front driver's seat" of his pickup with "his hand on his abdomen . . . gasping for air." T.N. was taken to the hospital and died of a gunshot wound.

*The Trial*

Three investigators testified at trial. The first investigator testified that the front passenger window of T.N.'s pickup was "broken out." The first investigator recovered fingerprints from the passenger-side door of the pickup. Forensic analysis showed that the fingerprints did not match Peterson, and one fingerprint matched T.N.'s friend, who told investigators that he had been in T.N.'s pickup "about four days prior" to the shooting but was in jail at the time of the shooting. Investigators later learned that T.N.'s friend was not in jail when T.N. was shot.

Along with many facts summarized above, J.S. testified that, around 4:30 a.m. on September 22, she received a social-media message from Peterson "stating that he needed [her] to call him." J.S. testified that she called Peterson and that "he was frantic, and he stated that he didn't mean for it to escalate the way it did and that [T.N.] just kept lunging at him, and he pulled the trigger but [T.N.] had a pulse when he walked away." J.S. testified that Peterson "said he needed to leave town, and then he hung up."

The state offered evidence that on September 24, law enforcement executed a search warrant at C.B.'s home on 62nd Avenue. Inside a bedroom in C.B.'s house, officers found a wallet with Peterson's identification. Inside C.B.'s garage, officers found a gun case designed to accommodate a long gun. The case contained one "unfired" cartridge. DNA analysis of the gun case matched C.B.'s DNA.

Law enforcement did not recover a fired bullet casing during their "initial article search" of T.N.'s pickup and the surrounding area on September 22. On September 26, law enforcement "found a fired casing in the leaves" on 62nd Avenue just north of Bristol

8

Street. The casing was "approximately 40 feet" from where law enforcement found T.N.'s pickup on September 22.

The first investigator testified that the "unfired round from the gun case in [C.B.'s] garage" was "very similar" to the fired casing found on 62nd Avenue. Both were stamped with the text "7.62 by 39," which the first investigator believed to be "the length and diameter of the casing," and contained the same "unknown symbol or marking." The Minnesota Bureau of Criminal Apprehension could not determine whether the unfired cartridge and the fired casing "had ever been cycled through the same weapon." Law enforcement did not find the murder weapon, nor did they find a long gun in C.B.'s house or garage.

A second investigator interviewed Peterson on September 24 at police headquarters. Peterson stated that, after they left J.S. at the convenience store, C.B. dropped Peterson off at C.B.'s house on 62nd Avenue before driving towards T.N.'s pickup with a "very large rifle." A recording of the interview was received into evidence.

Peterson did not testify at trial or call any witnesses. The jury found Peterson guilty of aiding and abetting second-degree murder. The district court sentenced Peterson to 346 months in prison.

Peterson appeals.

## DECISION

Peterson argues that the record evidence is insufficient to sustain his conviction on appeal. Due process requires that the state prove every element necessary to convict the

defendant of the crime charged beyond a reasonable doubt. *State v. Burg*, 648 N.W.2d 673, 677-78 (Minn. 2002).

The jury found Peterson guilty of aiding and abetting second-degree murder, which requires proof that he aided and abetted the death of another that was caused with intent but without premeditation. *See* Minn. Stat. § 609.19, subd. 1(1) (providing that "[w]hoever . . . causes the death of a human being with intent to effect the death of that person or another, but without premeditation," is guilty of second-degree murder). "To impose liability under the aiding and abetting statute, the state must show some knowing role in the commission of the crime by a defendant who takes no steps to thwart its completion." *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn. 1995) (quotation omitted); *see also* Minn. Stat. § 609.05, subd. 1 (2018) ("A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.").

### A.    The circumstantial-evidence standard of review applies.

Before evaluating the sufficiency of the evidence, we consider whether the record evidence was direct or circumstantial because the nature of the evidence affects our standard of review. *See State v. Horst*, 880 N.W.2d 24, 39-40 (Minn. 2016) (deciding whether to evaluate the sufficiency of the evidence using the circumstantial-evidence standard or the traditional standard based on direct evidence). Direct evidence is "based on

personal knowledge or observation and . . . if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotation omitted).[3]

Circumstantial evidence is evidence from which the jury "can infer whether the facts in dispute existed or did not exist" and therefore "always requires an inferential step to prove a fact that is not required with direct evidence." *Id.* (quotation omitted). If circumstantial evidence is used to prove the elements of the crime challenged on appeal, appellate courts apply a two-step analysis, which we describe below. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013).

Peterson argues that this court should apply the circumstantial-evidence standard of review because the evidence presented at trial was "almost entirely" circumstantial, and if any of the material elements of the crime "are based on circumstantial evidence, that is the standard of review." The state argues that this court should affirm Peterson's conviction based on the circumstantial-evidence standard of review, or alternatively, Peterson's conviction "should be affirmed based on direct evidence alone." The state contends that the direct evidence includes J.S.'s testimony of the events just before the shooting and Peterson's confession to shooting T.N.

We are not persuaded by the state's argument that we may apply the direct-evidence standard of review, for two reasons. First, the evidence provided in J.S.'s testimony is not

---

[3] If direct evidence is sufficient to prove the elements of the crime challenged on appeal, then appellate courts apply the traditional standard of review. *Horst*, 880 N.W.2d at 39-40 ("Under the traditional standard, we limit our review to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." (quotation omitted)).

11

direct evidence of all necessary elements of the crime because it requires an inferential step to conclude that Peterson aided and abetted second-degree murder. *See Harris*, 895 N.W.2d at 599. Second, even if we assume that Peterson's confession to J.S. is direct evidence of all necessary elements of the crime, corroborating evidence is required to sustain his conviction on appeal. Minn. Stat. § 634.03 (2022) ("A confession of the defendant shall not be sufficient to warrant conviction without evidence that the offense charged has been committed . . . ."); *State v. Holl*, 966 N.W.2d 803, 814 (Minn. 2021). Neither J.S. nor any other witness saw who shot T.N. "When the direct evidence of guilt on a particular element is not alone sufficient to sustain the verdict," appellate courts apply the circumstantial-evidence standard of review. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017). Accordingly, we apply the circumstantial-evidence standard of review because, if we set aside the confession, there is only circumstantial evidence to prove some elements of the crime of conviction.

The circumstantial-evidence standard of review has two steps, which we address in turn.

### B.     The circumstances proved include J.S.'s testimony.

In the first step, an appellate court must "identify the circumstances proved." *Silvernail*, 831 N.W.2d at 598. In doing so, appellate courts "defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 598-99 (quotation omitted). Appellate courts also "construe conflicting evidence in the light most favorable to the verdict." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008). "Stated differently, in determining the

circumstances proved, [appellate courts] consider only those circumstances that are consistent with the verdict . . . because the jury is in the best position to evaluate the credibility of the evidence even in cases based on circumstantial evidence." *Silvernail*, 831 N.W.2d at 599 (citation omitted).

The parties disagree about which facts are the circumstances proved. We note that "where circumstances are uncontroverted, come from a state witness, and are not necessarily contradictory to the verdict, they constitute circumstances proved." *State v. German*, 929 N.W.2d 466, 473 (Minn. App. 2019). In other words, we consider the state's evidence that does not contradict the verdict to be the circumstances proved. While appellant's brief to this court points out several inconsistencies in J.S.'s testimony, her testimony is consistent with the jury's verdict and is therefore included in the circumstances proved.

The state proved these circumstances at Peterson's trial: J.S. and T.N drove to C.B.'s house to buy drugs at 12:46 a.m. T.N. parked "a couple blocks away" from C.B.'s house and waited in his pickup while J.S. met with C.B. Then J.S. and C.B. got into C.B.'s silver Hyundai Elantra, a "little car" with "[l]oud exhaust," and drove a few blocks away to make a drug transaction and use methamphetamine. After about 15 minutes, T.N., who was on foot, approached C.B.'s car, assaulted C.B., and attempted to rob him. T.N. pulled C.B. out of the car and said something like, "Give me all your sh-t." In response, C.B. punched T.N., and T.N. left. C.B. asked who attacked him, and J.S. told C.B. that it was her "ride." C.B. "kind of chuckled" and said, "[W]e'll take care of it."

13

C.B. and J.S. drove back to C.B.'s house, where C.B. retrieved a gun. Peterson joined them in C.B.'s car. C.B. and Peterson asked J.S. to call T.N. During this call, T.N. repeatedly apologized for attacking C.B.; in response, C.B. was "too calm" and asked T.N. to "meet up and talk." T.N. agreed to meet and said that J.S. knew where he was parked.

C.B. handed the gun to Peterson, who was in the back seat. C.B. drove J.S. to a convenience store, explaining that he "didn't want [her] to be there for it." During the drive, C.B. or Peterson asked J.S. if she had T.N.'s parents' number "because somebody would need to know where the body was." After this remark, both C.B. and Peterson laughed. At 1:40 a.m., C.B. dropped J.S. off in an area that was not well lit but close to the convenience store because "they thought there wouldn't be as [many] cameras, or that they wouldn't be seen as well dropping [J.S.] off there."

After she exited C.B.'s car and the car drove away, J.S. spoke with T.N. by phone and "begged him to leave where he was parked" because she "didn't think it was going to turn out good." At 1:45 a.m., C.B.'s car turned onto 62nd Avenue from Green Street, "swerved in the oncoming traffic lane . . . and then corrected itself and continued south on 62nd Avenue" toward where T.N.'s pickup was parked. Before 1:47 a.m., witnesses heard voices yelling and arguing near 62nd Avenue and Bristol Street. At 1:47 a.m., there was a gunshot. Immediately after the gunshot, a vehicle with "loud exhaust" or a "worn-out muffler" left the scene. A large SUV also sped south on 62nd Avenue.

At 1:51 a.m., law enforcement found an injured T.N. in the driver's seat of his pickup, gasping for air. T.N. later died at the hospital of a gunshot wound. A few hours after T.N. was shot, Peterson contacted J.S. via a social-media account. Peterson told J.S.

14

when she called that he "pulled the trigger" after T.N. lunged at him. Peterson also said that T.N. had a pulse when he left the scene.

No gun was recovered. Subsequent law-enforcement investigation found a fired casing near where T.N.'s pickup was parked, which was "very similar" to an unfired cartridge in a gun case in C.B.'s garage. DNA on the gun case matched C.B.'s DNA. Forensics also identified fingerprints found on the passenger-side door of T.N.'s pickup; the fingerprints matched T.N.'s friend, who told law enforcement that he was in T.N.'s pickup four days before the September 22 incident. T.N.'s friend also told law enforcement he was in jail on September 22, but law enforcement later discovered that T.N.'s friend was not in jail at that time.

## C.     The circumstances proved are consistent with guilt.

In the second step, appellate courts must "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Silvernail,* 831 N.W.2d at 599 (quotation omitted). Appellate courts "review the circumstantial evidence not as isolated facts, but as a whole," and "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved." *Id.* (quotation omitted). If an alternative hypothesis is "untied to the evidence before the jury," that hypothesis is "wholly speculative" and does not warrant reversal. *German*, 929 N.W.2d at 475. "[I]nconsistencies in the state's case or possibilities of innocence" do not require reversal so long as the evidence as a whole "makes such theories seem unreasonable." *Tscheu*, 758 N.W.2d at 858.

15

Peterson argues that the circumstances proved are inconsistent with his guilt. Peterson argues that the "State's case was riddled with reasonable doubt" because J.S. was "demonstrably incredible" and several witnesses heard voices yelling and arguing before C.B.'s car could have arrived at the scene. The state argues that the circumstances proved are consistent with guilt and that Peterson's theory of innocence relies on facts that are not part of the circumstances proved.

We reject Peterson's argument for two reasons. First, an appellate court does not assess J.S.'s credibility when determining the circumstances proved. Witness credibility is for the jury to determine because "[j]uries are generally in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony." *State v. Andersen*, 784 N.W.2d 320, 329, 332-33 (Minn. 2010) (concluding circumstantial evidence was sufficient to convict the defendant of first-degree murder); *see also State v. Stein*, 776 N.W.2d 709, 718 (Minn. 2010) (deferring to the jury's credibility determinations in identifying the circumstances proved). Based on the jury's verdict, the jury found that J.S. was credible.[4]

---

[4] Peterson's brief to this court argues that J.S.'s "version of events [was] riddled with falsehoods and inconsistencies." For example, Peterson points out that J.S. "told [C.B.] where [T.N.] was parked, even though she was 'nervous' and worried about a confrontation"; J.S. testified that she called T.N. after being dropped off at the convenience store, but T.N.'s call log showed he called J.S.; J.S. described C.B. as both "calm" and "really angry"; and J.S. testified that Peterson called her to "1) confess; 2) beg [for] her forgiveness; and 3) ask for a pile of money to skip town" despite barely knowing her. We note that all the "inconsistencies" Peterson claims are in the record and were presented to the jury, which assessed J.S.'s credibility and the accuracy of her testimony. We will not second-guess the jury's credibility finding.

Second, Peterson misapplies the standard of review. Peterson contends that the state's evidence about yelling and arguing before the gunshot shows that T.N. was "already arguing with the people who shot him" before Peterson and C.B. could have arrived at the scene. Peterson argues that two neighbors testified to hearing a five-minute argument before the gunshot while the Green Street camera showed Peterson and C.B. driving towards T.N.'s pickup about two and a half minutes before the gunshot.

But Peterson's timeline is inconsistent with the guilty verdict. The jury found that Peterson assisted in murdering T.N. based on evidence that, (a) at 1:45 a.m., C.B.'s car—with two occupants—was driving towards where T.N.'s pickup was parked and, (b) at 1:47 a.m., T.N. was fatally shot. Thus, the jury apparently rejected the two neighbors' testimony about a five-minute argument or found that the argument did not involve C.B. or Peterson. Accordingly, the "five-minute argument" is not included in the circumstances proved. *See Silvernail*, 831 N.W.2d at 599. We conclude that the circumstances proved, as detailed above, are consistent with guilt.

### D. The circumstances proved are inconsistent with any rational hypothesis except that of guilt.

Peterson argues that the circumstances proved are consistent with two reasonable alternative hypotheses, which we consider in turn. First, Peterson contends that the circumstances proved are consistent with proving that T.N.'s friend, or an unknown person, shot T.N. and drove away in an SUV (SUV hypothesis). This hypothesis is based on the testimony of two neighbors who saw an SUV or other large vehicle speeding away after the gunshot. Peterson also relies on the fingerprints found on T.N.'s pickup, which matched

17

T.N.'s friend, and evidence that T.N.'s friend lied to law enforcement about being in jail on the night of the murder.

The state argues that no vehicle larger than a sedan was at the scene at the time of the gunshot because the "evidence most favorable to guilt shows that [C.B.]'s car was the only car in the area." The state contends that Peterson's SUV hypothesis should be dismissed as inconsistent with the guilty verdict. We disagree with the state's analysis. Evidence of an SUV driving away from the scene after the gunshot is not inconsistent with Peterson's guilt. Simply put, both C.B.'s sedan and an SUV may have driven away from the scene after the shooting.

Keeping in mind that both C.B.'s sedan and the SUV may have been at the scene at the time of the shooting, we consider Peterson's SUV hypothesis—that T.N.'s killer was someone in an SUV. We reject the SUV hypothesis, however, because it does not account for or conflicts with, for example, the following circumstances proved. C.B.'s sedan was driving toward T.N.'s pickup two minutes before the shooting. T.N. assaulted and attempted to steal drugs from C.B., who fought back and then pursued T.N. after he ran away. C.B. retrieved a gun and got Peterson; C.B. and Peterson talked to T.N., secured T.N.'s promise to meet up, dropped J.S. off so she would not see what happened, and after laughing about T.N.'s parents finding his body, drove back toward where they planned to meet up with T.N.

Peterson's SUV hypothesis also involves speculation. No evidence establishes any connection between T.N. and the SUV or between T.N.'s friend and the SUV. In fact, other than two neighbors seeing an SUV drive away after the gunshot, no evidence establishes

18

any connection between the SUV and T.N.'s murder—for example, who was in the SUV, whether the SUV's occupant(s) interacted—much less yelled or argued—with T.N., or whether the SUV's occupant(s) had a gun.[5]

Peterson tries to bolster the SUV hypothesis by arguing that the Green Street camera showed C.B.'s sedan turning onto 62nd Avenue and "veer[ing] around something in the road." Peterson posits that C.B. could have been veering around T.N. and the SUV occupant(s) yelling and arguing. Peterson relies on the third investigator's testimony describing the path of C.B.'s sedan as seen in the Green Street camera's recording. But the third investigator's testimony about the recording does not provide any evidence that T.N. was outside his pickup—or that any people were on 62nd Avenue at the time C.B.'s sedan veered. Thus, Peterson's SUV hypothesis rests on speculation.

Unlike Peterson's SUV hypothesis, the circumstances proved create a complete chain of events leading to Peterson's guilt of aiding and abetting T.N.'s murder. Along with evidence about T.N.'s assault and attempted robbery of C.B, C.B. told J.S. that "we'll take care of" T.N., C.B. picked up Peterson and a gun from his home; Peterson held the gun in C.B.'s car; Peterson and C.B. laughed about T.N.'s parents needing to know where to find T.N.'s body; they dropped off J.S. at a convenience store, telling her she should not

---

[5] Peterson also argues that T.N.'s statement to J.S. at the end of their call tends to prove that the SUV was driving toward T.N. well before C.B.'s sedan neared the same location. J.S. testified that, while she was at the convenience store and talking to T.N. by phone, he told her that he saw "headlights and he assumed it was them." Peterson points out that this evidence is consistent with an SUV arriving before C.B.'s sedan because the call ended at 1:43 a.m. and C.B.'s car "didn't arrive for nearly another 1-2 minutes." But as noted above, both an SUV and C.B.'s sedan could have been in the area at the time T.N. was shot.

be "there" for what would happen next; C.B.'s sedan with two occupants arrived on 62nd Avenue about two minutes before neighbors heard a gunshot and a vehicle with loud exhaust driving away. Shortly after the gunshot, law enforcement found T.N. shot in his pickup. A few hours after the shooting, Peterson called J.S. and said that he shot T.N. Near the shooting scene, law enforcement recovered a fired casing that was "very similar" to an unspent cartridge in a gun case in C.B.'s garage; the gun case had C.B.'s DNA on it. The state's evidence, as a whole, "form[s] a complete chain that . . . leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *Stein*, 776 N.W.2d at 714 (quotation omitted). Thus, Peterson's SUV hypothesis is unreasonable.

Peterson's second alternative hypothesis is that C.B. dropped Peterson off at C.B.'s house before C.B. shot T.N. (drop-off hypothesis). This hypothesis is based on Peterson's statement to law enforcement that, after driving away from the convenience store, he and C.B. exited from I-35 at Cody Street and drove south on 63rd Avenue, east on Bristol Street, then south on 62nd Avenue to C.B.'s house. Peterson stated that, when they returned to C.B.'s house, he exited the car and someone came "out of the garage area with a very large rifle" and gave the gun to C.B. Peterson stated that C.B. then "took off at a high rate of speed . . . towards Bristol Street."

The state responds that Peterson could not have been dropped off at C.B.'s house before the shooting based on the time, location, and direction of C.B.'s car on the surveillance-camera recordings. We agree with the state that Peterson's drop-off hypothesis conflicts with the Cody exit camera showing C.B.'s car exiting I-35 at Cody

20

Street at 1:43 a.m. and, about one and a half minutes later, turning from Green Street onto 62nd Avenue heading south towards T.N.'s pickup.

The state offered evidence at trial that when law enforcement drove the route that Peterson described in his statement, "it took about three minutes and 10 seconds" to drive from the I-35 Cody Street exit, past C.B.'s house, and to the corner of Green Street and 62nd Avenue. Accordingly, Peterson's drop-off hypothesis is not reasonable. If C.B. had dropped off Peterson at C.B.'s house before the shooting, then C.B.'s car would have been recorded heading towards T.N.'s pickup at around 1:47 a.m. rather than at 1:45 a.m.

Peterson cites three circumstantial-evidence cases to support his argument for reversal based on either of his alternative hypotheses: *Bernhardt v. State*, 684 N.W.2d 465 (Minn. 2004); *State v. Jones*, 516 N.W.2d 545 (Minn. 1994); and *State v. Berndt*, 392 N.W.2d 876 (Minn. 1986). Because it helps our legal analysis, we consider this caselaw.

First, in *Bernhardt*, Bernhardt was convicted of aiding and abetting a second-degree murder by ordering others to kill the victim from jail. 684 N.W.2d at 467. Bernhardt and Caldwell were arrested at the victim's home and jailed. *Id.* at 468-69. Days later, others— known associates of Bernhardt and Caldwell—beat and murdered the victim to punish the victim for "snitch[ing]" on Bernhardt and Caldwell. *Id.* at 469-70. On appeal, Bernhardt argued two alternative hypotheses: first, that Caldwell, not Bernhardt, ordered the murder or, second, that the killers acted on their own in murdering the victim without any instruction from Bernhardt. *Id.* at 478-79.

21

The supreme court reversed Bernhardt's conviction after concluding that the "facts in the record" were "consistent" with both alternative hypotheses. *Id.* at 479. The supreme court pointed to the "volume of damning evidence against Caldwell," including "Caldwell openly talk[ing] about the possibility of murdering" the victim if the victim "was the 'snitch' because [Caldwell] had murdered at least one 'snitch' in the past." *Id.* at 478. The supreme court also determined that the victim's murder "could have constituted the escalating actions of irrational individuals that became an out-of-control melee" based on heavy methamphetamine use around the time of the murder and the belief that the victim was a snitch. *Id.* 478-79.

Second, in *Jones*, the jury found Jones guilty of aiding and abetting the second- and third-degree assault of a coworker. 516 N.W.2d at 546-47. The day before the assault, Jones's coworker grabbed Jones by his shirt and threatened to punch him, resulting in Jones wetting his pants. *Id.* at 547. The next day, Jones told his brother what happened, and the brother tracked down the coworker and shot him with Jones's gun. *Id.* Jones was not present during the shooting. *Id.* On appeal, the supreme court identified an alternative hypothesis inconsistent with Jones's guilt: that Jones's brother decided to attack the coworker of his own volition and without any instruction from Jones. *Id.* at 549 & n.5. The court reversed Jones's conviction after determining that "[o]ther rational conclusions" were "consistent with the evidence presented." *Id.* The court pointed to evidence that Jones's brother had previously used, and had access to, Jones's gun. *Id.*

Third, in *Berndt*, Berndt was convicted of the first-degree murders of his wife and children. 392 N.W.2d at 876. The state proved that, after a night out with friends, Berndt

22

and his wife returned home to their children and fell asleep. *Id.* at 877. Berndt testified that he awoke to smoke and flames and ran outside before the entire house burst into flames. *Id.* He was the only one to survive the fire; his wife and three children died. *Id.*

The supreme court reversed Berndt's conviction, stating that Berndt's physical presence at the house when the fire started was the only evidence "consistent with the state's hypothesis of [Berndt's] guilt." *Id.* at 880. The supreme court noted that Berndt had "spent [the] evening drinking and smoking marijuana." *Id.* at 879. The supreme court determined that it was "not rational" to infer that an intoxicated Berndt "could slosh 5 gallons of gasoline around the townhouse"—as the state alleged—"without almost inevitably spilling some of the gas on himself or his clothing," yet "no witness . . . detected a gasoline odor about his person or clothing." *Id.* at 880. The supreme court concluded that "substantially all of the circumstances are consistent with a rational hypothesis other than guilt": that the fire was an accidentally ignited "flashback fire."[6] *Id.* at 880.

These three cases support our conclusion that Peterson's alternative hypotheses are not reasonable.[7] In all three supreme court cases, the alternative hypotheses formed a complete chain of events supported by the evidence. Peterson's two alternative hypotheses

---

[6] A flashback fire is "created when a fresh supply of oxygen, such as a door opening, reignites a smoldering fire or a build-up of gases, and the resulting fire flashes back across a room." *Id.* at 878 n.4.

[7] Peterson also cites *El-Shabazz v. State*, 754 N.W.2d 370 (Minn. 2008), arguing that J.S.'s "testimony is significantly undermined by the witnesses present at the scene, just as the witness in *El-Shabazz* was." *El-Shabazz*, however, is not a sufficiency-of-the-evidence case. 754 N.W.2d at 372. And as noted above, we must assume the jury found J.S. credible, and we defer to the jury's credibility determinations.

rely on evidence that is inconsistent with the circumstances proved—such as the time, locations, and direction C.B.'s car traveled toward T.N.'s parked pickup or the five-minute argument. Or Peterson's alternative hypotheses are unsupported by the evidence as a whole—for example, C.B.'s plan for him and Peterson to "meet up" with T.N. and "take care" of him after T.N.'s attempted robbery and assault, C.B. enlisting Peterson and obtaining a gun, C.B. dropping off J.S. so she would not see what happened, C.B. or Peterson joking about notifying T.N.'s parents about his body, and C.B.'s sedan with two occupants driving toward T.N.'s pickup just before T.N. was fatally shot. Accordingly, Peterson's alternative hypotheses are unreasonable.

In sum, the circumstances proved form a complete chain establishing Peterson's guilt and are inconsistent with any rational hypothesis except that of guilt. Thus, we conclude that the circumstantial evidence is sufficient to sustain Peterson's conviction.

**Affirmed.**